## COLE *v.* THE LAKE COMPANY.

*Practice in Equity—Reformation of Lease—Construction of written contract—Words necessary to pass a fee.*

Where neither the rights nor liabilities of the assignor of a lease will be affected by a decree upon a bill in equity brought to reform the instrument, there is no rule of practice which imperatively requires that such assignor should be joined as plaintiff in the bill.

The assignment of the lease by the plaintiff after the commencement of such proceeding is not cause for dismissing the bill, the *lis pendens* being sufficient notice to the assignees so that they will be bound by the decree.

The court, at the law term, do not receive and consider additional evidence upon the hearing of questions reserved in equity.

A lease conveyed the right to draw a certain quantity of water from a canal of the lessors to the mills of the lessees, etc.  It contained various covenants, and among them a stipulation by the parties that "all the covenants and agreements therein contained shall extend to and bind their legal representatives." It also contained this reservation :

"Excepting and reserving to the said lessors, however, the control of the water in the W. river, and in all mill-ponds, bays, lakes, and reservoirs at and above said premises, with the right of holding back and retaining and discharging the water therefrom at their pleasure, an abatement of the rent hereinafter mentioned being made in case said lessees shall be interrupted in the use of said mills thereby." Upon a consideration of the whole instrument together, it was *held*, that the lessors could not, at their pleasure, erect a barrier to prevent the flow of water from their reservoir into the canal, and in that way terminate the lease, when such course was not necessary in their general control and management of the water.

The habendum was to the lessees "for and during their pleasure." *Held*, upon the whole instrument, not to create a strict tenancy at will, but a covenant for perpetual enjoyment by the lessees.

The lease did not contain the word "heirs," but the language used, in its common and natural sense, showed a clear and unmistakable intention to convey a perpetual right or fee.  *Held*, that the court were bound to give effect to the intention and contract of the parties as thus expressed; and that there is in this state no rule of law that a fee can never pass by deed without the word "heirs" be used.

IN EQUITY.  The plaintiff's bill is as follows:  Benjamin J. Cole, of Gilford, in said county, complains against the Winnipisseogee Lake Cotton and Woolen Manufacturing Company, a corporation duly established by law, and doing business at Lake Village, in said county of Belknap, and says :

1. That just prior to and on the twenty-third day of November, 1852, the plaintiff and John A. Cole and John Davis, 2d, who were then partners in the business under the name of Cole, Davis & Co., were in the occupation of a certain lot of land belonging to the defendants, situated at Lake Village, and of the water-rights connected therewith, on which a certain foundry and other buildings belonging partly to the defendants and partly to the plaintiff, and the said John A. Cole and John Davis, 2d, then stood.

2. That the plaintiff and said John A. Cole and John Davis, 2d, had previously held a written lease of said premises from the defendants, which, prior to said twenty-third day of November, had expired.

3. That on said twenty-third day of November, the plaintiff and said

John A. Cole and John Davis, 2d, purchased the premises of the defendants, and took a conveyance thereof in due form.

4. That on the said twenty-third day of November, the defendants and the plaintiff, and the said John A. Cole and John Davis, 2d, interchangeably executed and delivered an indenture, as follows,—viz., "This indenture, made the twenty-third day of November, A. D. 1852, witnesseth, that the Winnipisseogee Lake Cotton and Woolen Manufacturing Company do demise and lease unto John A. Cole and Benjamin J. Cole, both of Gilford, in the county of Belknap and state of New Hampshire, and John Davis, 2d, of Meredith, in said county and state, the right to draw water from the canal leading from the Lyford sawmill, connected with the dam of said company at said Lake Village, in Gilford, through the flume leading from said canal to the mills and buildings on the premises, this day conveyed to them by said company for the use and operation of their mills and machinery on said premises, provided the quantity of water so drawn and used shall not exceed a sufficient supply for driving the water-wheel at present used by said lessees, and one other water-wheel requiring an equal quantity of water; and provided, also, that said lessees shall maintain and keep in repair the said flume, having the right for that purpose to enter upon the premises of said company, doing no unnecessary damage, and leaving the surface in as good condition as they find it, excepting and reserving to the said lessors, however, the control of the water in the Winnipisseogee river, and in all mill-ponds, bays, lakes, and reservoirs at and above said premises, with the right of holding back and retaining and discharging the water therefrom at their pleasure, an abatement of the rent hereinafter mentioned being made in case said lessees shall be interrupted in the use of said mills thereby; to have and to hold said demised premises to said lessees for and during their pleasure, the said lessees yielding and paying therefor the yearly rent of one hundred and fifty dollars, by equal quarter-yearly payments, on the first days of January, April, July, and October, in every year during said term. And the said lessees covenant with the said lessors that they will, during said term, pay the said rent, and that they will keep said flume in proper repair so as not to waste water from said dam; provided, that if said lessees shall fail to perform either of said covenants on their part to be performed, the said lessors may immediately or at any time thereafter, while said neglect or default continues, shut off the water and prevent its flowing through said flume without prejudice to any other remedy which said lessors may have for breaches of said covenants. And the said lessors covenant with the said lessees that they, performing the covenants aforesaid, shall peaceably enjoy said right during said term, and that they will keep said dam in repair so as to afford the use of the water as aforesaid, subject to the exercise of the right above reserved by said lessors to control the water.

" And the said parties agree with each other, that all the covenants and agreements therein contained shall extend to and bind their legal representatives.

"In testimony whereof the said parties have hereunto interchange-
ably set their hands and seals the day and year aforesaid.

                    The Winnipisseogee Lake Cotton and Woolen
                    Manufacturing Company, by their agent,
                              JAMES BELL.                    [SEAL.]
Signed, sealed, and delivered in ⎫    JOHN A. COLE.          [SEAL.]
         presence of            ⎪    JOHN DAVIS, 2d.         [SEAL.]
     JOHN A. COLBY,             ⎬    BENJ. J. COLE.          [SEAL.]
     IRA F. FOLSOM.             ⎭

"BELKNAP SS. Dec. 6, 1862. Personally appearing, James Bell ac-
knowledged the foregoing instrument to be the free act and deed of the
said company.

          Before me—      IRA F. FOLSOM, Justice of the Peace.

     Belknap County Records.   Received March 24, 1854, 8 P. M.   Re-
corded Book 22, page 525.

          Examined by          NATH'L EDGERLY, Regr."

5. That on the eighteenth day of December, 1856, the said John
Davis, 2d, for a valuable consideration, transferred and assigned to the
plaintiff all his right, title, and interest in said indenture.

6. That on the ninth day of September, 1857, the said John A. Cole,
for a valuable consideration, transferred and assigned to the plaintiff
all his right, title, and interest in said indenture.

7. That on said twenty-third day of November the plaintiff contem-
plated the erection of a machine-shop on a certain lot of land called
the Tucker lot, lying adjacent to the land conveyed by the defendants
as hereinbefore described, and the plaintiff procured in and by said in-
denture a grant of water for a second wheel for the use of said ma-
chine-shop whenever the same should be erected, all of which was then
understood and agreed to on the part of the defendants, by their duly
authorized agent, the late James Bell.

8. That the contract between the defendants and the said lessees, as
verbally made a short time before said indenture was executed, was
that the defendants should lease to them, for seventy-five dollars per
annum, the right to draw water through the flume referred to in said
indenture, for the use of the mills and machinery on the premises con-
veyed by the defendants to the said lessees, not exceeding a sufficient
supply to drive the water-wheel then in use on said premises.

9. That subsequently, before said indenture was executed, an addi-
tional agreement was made between the parties for the leasing of an
equal additional quantity of water for the use of said machine-shop, at
an additional rent of seventy-five dollars per annum, making one hun-
dred and fifty dollars per annum in the whole, but without any agree-
ment or understanding that the right to draw said additional quantity
of water was to depend in any degree on the capacity of said flume to
discharge water, or that said additional water should be drawn through
said flume, nor that it should be used for driving mills or machinery

situated on the premises conveyed as aforesaid by the defendants to the said lessees, nor had the plaintiff, nor the said John A. Cole or John Davis, 2d, any thought or expectation, before the drafting of said indenture, that it was to contain any restriction in respect to the manner of driving water from said canal for the use of said second wheel, or to the place of using the same, nor did it at any time occur to them, or either of them, until after said third day of October, 1870, that the language contained in said indenture might in any event bear such a construction.

10. That the words, " through the flume leading from said canal to the mills and buildings on the premises this day conveyed to them by said company, for the use and operation of their mills and machinery on said premises," contained in said indenture, were never intended by any of the parties thereto to be applicable to the words, " and one other water-wheel requiring an equal quantity of water," subsequently inserted in said indenture; and if the court shall hold that, upon a true construction of said indenture, they are so applicable, then the plaintiff says, that through mistake and accident the said indenture was drawn contrary to the true intent and meaning of the parties in that respect.

11. That the said John A. Cole and John Davis, 2d, were not at any time interested in said machine-shop, but the same and the machinery therein were at all times owned by the plaintiff, and all that part of said indenture which provides for water for a second wheel was inserted for the benefit of the plaintiff, and the plaintiff at all times accounted to the said John A. Cole and John Davis, 2d, for one half the rent provided for in said indenture, until they had severally transferred and assigned to him their interest therein.

12. That during the summer of 1854 the plaintiff erected said machine shop on the Tucker lot, and required water for an additional wheel, as was provided for in said indenture, and thereupon, in the fall of 1854, the plaintiff and the said James Bell, agent of the defendants as aforesaid, went upon the premises for the purpose of locating a penstock, through which water should be drawn from said canal for the use of said machine shop, in accordance with the said agreement and understanding of the parties, and did then and there agree upon the location of said penstock.

13. That the plaintiff immediately afterwards proceeded to erect a penstock between said canal and said machine shop, along the southerly side of said flume, in the precise place where the plaintiff and the said James Bell had agreed that the same should be located, as hereinbefore stated.

14. That about forty-five feet of said penstock was thus located and erected on land of the defendants, an excavation having been made for the purpose of receiving it.

15. That the said penstock was located and erected, as hereinbefore stated, without the slightest objection on the part of the defendants, or from any other source whatever.

16. That immediately afterwards the plaintiff commenced drawing water through said penstock for the use of said machine-shop, and continued in the peaceable and uninterrupted exercise and enjoyment of the right to draw water for that purpose, for a period of about sixteen years, until on or about the third day of October, 1870.

17. That all the rents stipulated to be paid in and by said indentures have been paid, except the quarter's rents which fell due on the first day of October, 1870; and that was duly tendered to the defendants but was not received.

18. That neither the defendants, nor any person on their behalf, at any time called in question the right of the plaintiff to maintain said penstock, as it was originally located with the full consent and approbation of the defendants, by their duly authorized agent, as aforesaid, nor his right to draw water through it for the use of said machine-shop, nor objected to his using said penstock for the purpose of supplying water for said machine-shop, until on or about the said third day of October, 1870; nor did the plaintiff during all that time have any understanding, expectation, or suspicion that his right to maintain said penstock, and use it as aforesaid, was ever to be in any manner disputed.

19. That the expense of erecting said machine-shop was about ten thousand dollars, and the cost of the machinery and tools therein was about twenty-five thousand dollars, which several sums were laid out by the plaintiff in full faith that said shop was to be supplied at all times (subject to the exception and reservation provided for in said indenture) with all the water necessary to drive the machinery therein, not exceeding a sufficient supply for driving a water wheel like that which was used by the said lessees in said foundry on said twenty-third day of November; and the plaintiff never would have erected said machine-shop, nor expended any money for machinery to be used in it, had he not relied upon said indenture as entitling him to draw water from said canal for the purpose of driving said machinery.

20. That the said penstock having become old and out of repair, the plaintiff provided all the materials for a new penstock, and prepared the same, ready to be put together, in the months of July and August, 1870, at the expense of nearly one thousand dollars, and during the month of November, 1870, put the said materials together and constructed a new penstock, of the same size as the old one and in the place.

21. That a part of the foundry, situated on the land conveyed by the defendants to the said lessees, was destroyed by fire about the last of June, 1867, since which time the plaintiff has drawn no water through said flume; but he intends soon to rebuild the part destroyed by fire, and to draw water through said flume for the use of machinery therein.

22. That the water wheel which was used by the said lessees, at the time of the execution of said indenture, was a tub wheel, situated at the foot of said flume, which was driven by water flowing through two

spouts in the end of said flume, each of which was about sixteen and three fourths inches wide and thirteen and three fourths high, from the bottom of said flume, making a space of discharge equal to about two hundred and thirty square inches to each spout.

23. That the length of said flume, on the day said indenture was executed, was about eighty feet, its width five and a half feet, and its depth seven feet, at the outlet of said canal, and about nine and a half feet at the end where said spouts were situated; and said flume has continued to be of the same dimensions from that to the present time.

24. That at the time of the execution of said indenture the quantity of water which could be discharged through said two spouts, in the time of the greatest depth of water in the flume, was never more than sufficient to drive the said tub wheel for the use of the mills and machinery situated on the premises conveyed by the defendants to the said lessees as aforesaid.

25. That said canal, on said twenty-third day of November, extended north-westerly from said flume a distance of about ten rods, of the width of about nineteen feet, and, then turning, extended in a northerly direction to the dam of the defendants about five rods, of the width of twenty-five feet or more, and was in good condition, and contained no timbers, stones, or other material to obstruct the flow of water and prevent its free passage through said canal.

26. That the defendants, about twelve years ago, more or less, erected a partition, for a temporary purpose, in the centre of said canal, extending about sixty feet below said dam, and connected the southerly end of said partition with the westerly side of said canal, and thus prevented the flow of water into said canal except through that part of it lying easterly of said partition, being a width of only twelve feet, and without right have ever since continued to maintain said partition, and shut off a large portion of the water as aforesaid, thus greatly reducing the capacity of said canal to discharge water.

27. That the defendants, at the time of putting in said partition, placed large timbers across said canal, between said partition and the easterly side of the canal; and at other times the defendants have permitted stones and other materials to fall in said canal, which said timbers, stones, and other materials now remain there; and thus the defendants have prevented the free passage of water through said canal, as it of right ought to flow.

28. That the defendants, by the various acts hereinbefore charged, and by other acts of interference with the flow of water into and through said canal, have reduced the depth of water at the outlet of said canal greatly, to wit, two feet in low stages of water, and less at other times, and have thus greatly impaired the capacity of said canal to supply the quantity of water for the use of the plaintiff's wheels which the defendants engaged and are bound to furnish, subject only to the exceptions and reservations contained in said indenture.

29. That while the plaintiff was putting in said new penstock, during the month of November, 1870, the defendants threatened to prevent by

force the completion of the same, and would have attempted to do so but for the interference of the court by temporary injunction.

30. That the defendants at the same time threatened to remove or destroy a portion of said penstock, or to shut off the water at the outlet of said canal, and prevent the same from entering the said penstock, and would have done so but for the inteference of the court by said temporary injunction.

Wherefore the plaintiff prays that the defendants may be compelled (in addition to the lease of water for the first wheel as provided for in said indenture) to lease to the plaintiff (as a substitute for and lease of water for a second wheel, as provided for in said indenture) a right to draw water from said canal through said penstock for the use and operation of said machine-shop, in accordance with the understanding of the parties, prior to, on, and after said twenty-third day of November, provided the quantity of water so drawn and used shall not exceed a sufficient supply for driving the water-wheel used in said foundry by said lessees on said twenty-third day of November; or, that the said indenture may be reformed by correction of the errors and mistakes therein, so as to lease from the defendants to the plaintiff (as a substitute for the lease of water for a second wheel, as provided for in said indenture, and in addition to the lease of water for the first wheel, as provided for in said indenture) a right to draw water from said canal through said penstock, for the use and operation of said machine-shop, in accordance withthe understanding of the parties, prior to, on, and after said twenty-third day of November, provided the quantity of water so drawn and used shall not exceed a sufficient supply for driving the water-wheel used in said foundry by said lessees, on said twenty-third day of November; or, that the rights of the parties, by virtue of said indenture, may be defined by the court, and the right of the plaintiff to draw water for the use of said machine-shop, through the penstock located by the parties as aforesaid, not exceeding a sufficient supply for driving the water-wheel used by said lessees on said twenty-third day of November, or to draw water for the use of said machine-shop and of said foundry buildings, not exceeding a sufficient supply for driving two water-wheels like the one used by said lessees at the date of said indenture, whether the same may be drawn through said penstock or through said flume, or to enlarge the capacity of said flume by making it sufficiently wide and deep to enable the plaintiff to draw through it the amount of water to which he is entitled, may be established, and that an injunction may issue enjoining the defendants against destroying, injuring, or in any manner interfering with the plaintiff's penstock, or preventing the water of said canal from freely flowing therein, or preventing the plaintiff from drawing from said canal, through said penstock and through said flume, all the water necessary for the use and operation of his mills and machinery situated on the land conveyed by the defendants as aforesaid, or on said Tucker lot, not exceeding a sufficient supply for driving a water-wheel like that used by said lessees on said twenty-third day of November, and

one other wheel requiring an equal quantity of water, and that in and by said injunction the defendants may be enjoined against any further removing or filling up of the channel of said canal, and may be ordered by the court to remove therefrom the said partition so as to enlarge said canal from the dam to and below the southerly end of said partition to the full width of twenty-five feet or more, as the same was at the date of said indenture, and also to remove from said canal the said timbers, stones, and other materials which now obstruct the free course of the water therein, and to restore the same to its original and true condition; and that such other and further relief may be granted to the plaintiff as may be just.

The defendants filed an answer, in which all the allegations of the bill which entitle the plaintiff to the relief prayed for are either denied, or they deny knowledge with respect to the facts alleged and demand proof.

The cause was tried before SARGENT, C. J., at the September term, 1872, and he made the following report of facts for the consideration of the whole court:

I find that the facts alleged in said plaintiff's bill, and numbered in the statement there made from one to twenty-four inclusive, are proved. I therefore find that the indenture given by the defendants to the plaintiff and others, of November 23, 1852, should be reformed so as to express the true intentions of the parties by inserting in said indenture after the sentence, " and one other water-wheel requiring an equal quantity of water," the following, " with the right to take water for the use of this last-mentioned wheel from said canal, and convey the same through a penstock over the land of said Lake Company, and land this day sold by said company to said Cole and others, to the Tucker lot, so called, owned by said Benjamin J. Cole, and use the same in running a machine shop, or other machinery on said Tucker lot."

I also find that in the fall of 1854, said plaintiff, and said Bell as agent for said Lake Company, agreed upon the location of said penstock across said company's land, and they also agreed how large it should be, in order to supply the amount of water which the plaintiff was entitled to in order to run his wheel, which was to be located on said Tucker lot, so called, and that the plaintiff built his said penstock in accordance with said agreement; and that said plaintiff is and will be entitled to draw, for the supply of his wheel on said Tucker lot, under the said indenture when reformed as aforesaid, just so much water as, without any unnecessary waste, will run through said penstock as located and constructed in the year 1854, and no more.

I also find that the facts stated in the plaintiff's bill, in statements numbered from twenty-five to twenty-seven inclusive, are proved. But I find that hitherto the effect of said partition and obstructions, specified in statement No. 26 in said plaintiff's bill, has not been to injure the plaintiff materially; but that if he should put in other machinery in place of that burned in 1867, and use his other wheel in running it, as he has the right and proposes to do, then this partition and obstruc-

tion aforesaid would impede the flow of water, and would prevent there being a sufficient supply and a sufficient head of water at the outlet of said canal for all who would then be entitled to use water from said canal; and if the said defendant company is bound in law to keep their canal of the same dimensions, or to furnish the same head of water at the outlet thereof, as were used and enjoyed by the plaintiff at the date of said indenture, then said partition and obstructions should be removed, and I order the defendants to remove the same. This question of law I refer to the whole court.

I also find that statements Nos. 29 and 30 in the plaintiff's bill are substantially proved, and I order such injunction to issue as may be held by the court to be necessary to protect the plaintiff's rights, if any such is needed after such indenture is reformed as aforesaid.

At the hearing, the plaintiff was allowed to introduce the following testimony, subject to the defendants' exception. Said Cole stated that his machine-shop, machinery, and tools on the Tucker lot had cost him from $30,000 to $40,000, that amount having been expended from 1854 to 1869; that in 1855 or 1856 he had expended about $15,000, and after that he made additions as became necessary from time to time. The question of law raised by this exception is referred to the whole court, and all other questions of law that may properly arise upon the bill and answer and upon the facts found by me as above set forth.

Afterwards the following additional statement was furnished to the court by the chief justice, by way of amendment to the printed case.

At the hearing before me all the evidence was introduced that either party desired to introduce, or that was offered. After the testimony was closed the cause was argued by counsel, Mr. Pike making the argument for the defendants. Towards the close of his argument, upon a suggestion being made to him by associate counsel, he said there was one point upon which he might desire to introduce further evidence from the records of the company, but he did not ask the privilege of introducing it then, and the plaintiff said nothing. Some days after the hearing, Mr. Pike stated to me that the defendants desired to have the case opened so that they might introduce this record evidence. I said he had better see the counsel on the other side and agree about it if they could, but after waiting a few days longer and hearing nothing further from either side, I made my report. Questions of law were reserved on certain points for consideration at the law term. At the first law term a motion was made for leave to supply this evidence, and it was arranged that said motion should be heard before me in vacation.

Accordingly the parties appeared before me agreeably to notice, and in support of the motion of the defendants the affidavit of Josiah B. French was introduced, which was as follows: " I, Josiah B. French, depose and say that I am the agent of said company ; that prior to the day of the trial in November last of the bill in equity of Benjamin J. Cole against said company, before Chief Justice Sargent, I had been

engaged for two weeks or more in the trial of the suit of B. F. & B.
F. Holden, Jr., against said company, at Plymouth; that during said
last mentioned trial I was quite unwell with a chronic difficulty, so
much so that I was obliged to go out of the court room as often as
once in twenty to thirty minutes; that the trial of the Holden suit
closed about ten o'clock in the forenoon of the same day of the trial of
the said Cole's equity suit; that owing to my indisposition and engage-
ments in the Holden suit, I had not time to advise with my counsel
for the proper preparation of said Cole suit; and that, owing to the state
of my mind and said chronic difficulty which was greatly aggravated
by my confinement and labor during said trial, it escaped my mind to
put in certain evidence, being the vote of the directors of said com-
pany limiting the powers of the late James Bell leasing said com-
pany's water-power for a term not exceeding ten years; also a lease
from said company to the Boston, Concord & Montreal Railroad,
dated at or about the same time of said Cole's lease, which I deem to
be very material evidence to be considered in said suit.   Subscribed
and sworn to March 26, 1873.   Whereupon I heard the evidence offer-
ed *de bene esse*, and now submit to the court the question, whether,
upon the evidence in support of the motion, this record evidence ought
to be received.

The evidence from the records introduced was as follows:   An ex-
tract from the records of the defendant company, as follows:   "At a
meeting of the directors of the Winnipissiogee Lake C. & W. Man'g
Co., held at the counting-room of A. & A. Lawrence, in Boston, on the
21st day of November, 1846.

Present, ABBOTT LAWRENCE,
SAMUEL LAWRENCE,
JOHN A. LOWELL,
EBEN CHADWICK,
CHARLES S. STORROW.

"*Voted*, That James Bell, agent, be authorized to lease any unoccu-
pied water-power of said company, for terms not exceeding ten years,
reserving the control of the water so as to retain and draw down the
same at the pleasure of the company.

Attest:   JAMES BELL, Clerk."

Lease from the B. C. & M. Railroad, as follows:   " THIS INDEN-
TURE, made this twenty-seventh day of February, A. D. 1852, wit-
nesseth, that the Winnipissiogee Lake Cotton and Woolen Manufac-
turing Company do demise and lease unto the Boston, Concord &
Montreal Railroad, a corporation existing under the laws of the state
of New Hampshire, the right to draw water from the dam at Lake Vil-
lage, to and for the use of the machine- shop of said railroad.   The
said railroad is to have the right to draw water through their penstock
from the pond to their machine-shop to the full extent and capacity of
said penstock, as the same is now constructed, provided the quantity
of water used shall not exceed a sufficient supply for driving the water-

wheel at present used by said railroad at said place, and one other water-wheel requiring an equal quantity of water, excepting and reserving to the said lessors the control of the water in the Winnipissiogee river, and in all mill-ponds and reservoirs at and above said premises on said river, with the right of holding back and retaining and discharging by and across said demised premises the water thereof at their pleasure, an abatement of the rent hereinafter mentioned being made in case said lessee shall be interrupted in the use of said mills thereby.

" To have and to hold said demised premises to said lessee for the pleasure of said lessee, the said lessee yielding and paying therefor the yearly rent of one hundred and fifty dollars, by equal half yearly payments, on the first days of January and July in every year during said term. And the said lessee covenants with said lessors that he will, during said term, keep said penstock in proper repair so as not to waste water from said dam, said railroad having the right to keep said penstock in repair from said dam to said shop, reasonable use and wearing thereof excepted ; that said lessors may enter to view and to make improvements and repairs of said premises, and that said lessee will peaceably surrender up said premises to said lessors at the expiration of said term; provided, that if said lessee shall fail to perform either of said covenants on their part to be performed, the said lessors may immediately or at any time thereafter, while said neglect or default continues, enter into and repossess themselves of said premises, without prejudice to any other remedy which said lessors may have for breaches of said covenants.

"And said lessors covenant with said lessees that they, performing the covenants aforesaid, shall peaceably enjoy said premises during said term, and keep the dam in repair, so as to afford a free use of water as aforesaid, subject to the exercise of the right above reserved by controlling said water.

"And it is agreed by said parties, that in case the buildings upon said premises or any part thereof shall be destroyed by fire, a proportionate abatement of rent shall be made until the owners of such buildings shall rebuild or repair the same (which they may do at their option). And the said parties agree each with the other, that all the covenants and agreements herein contained shall extend to and bind their legal representatives, and that said railroad may terminate this lease at pleasure by giving three months' notice of the same to said manufacturing company.

" In testimony whereof the said parties have hereunto interchangeably set their hands and seals the day and year aforesaid.
Boston, Concord & Montreal Railroad,
               By J. QUINCY, President.          [L. S.]
The Winnipissiogee Lake Cotton and Woolen Manufacturing Company,
               By their Agent, JAMES BELL.          [L. S.]
     Signed, sealed, and delivered in presence of CHARLES LANE."
     Extract from the private memorandum-book of the late James Bell,

the same being in his handwriting, as follows: "Nov. 23, 1852. Sold to Cole, Davis & Co. the land where the foundry and other buildings occupied by them stand for $1,200, ½ payable in one and ½ in two years, secured by mortgage. They credited to me the $600, which I had pd. to the Co. towards their building the furnace. I at the same time leased to them the water-power for $150 per year, on similar terms to the lease made to the Railroad Co."

The plaintiff then offered an extract from the records of the defendant company, as follows: "At a meeting of the directors of the Winnipissiogee L. C. & W. Man'f'g Co., held June 30, 1852, James Bell was in like manner [by ballot] chosen Clerk of the Directors, and was appointed Agent of the Company."

" *Voted,* That the sale of the real estate of the company at Franklin, and the sales of lots of land at Lake Village, made by the agent of this company, be ratified and confirmed, and that the said agent be authorized to sell and execute, on behalf of this company, conveyances of such portions of their real estate as are not required for the purposes for which said purchases were made."

If the above evidence from the records shall be received and considered, and its legal construction and effect should be such as to affect the finding of the court upon the facts in the case, such finding is to be modified accordingly. If any new fact not found before becomes material, such fact may be sent to the trial term to be found in such way as is proper. If the new evidence does not, as matter of law, affect the finding of the court, nor raise any new question of fact to be tried, then the finding of the court is to remain unchanged.

*Ira A. Eastman,* for the defendants.

As this case now stands, before we are aware what the decision may be in regard to the evidence offered before the chief justice, upon the application of the defendants for a rehearing, consisting of the vote of the company limiting the power of the agent to lease, the record of Mr. Bell as to said lease, the lease to the railroad, etc., we are necessarily confined to the matters presented by the case reserved for the consideration of the whole court, and to such questions as may properly arise thereon.

I. The first question which suggests itself, as arising upon the finding of the court, is this: Can the plaintiff use the quantity of water required to fill the penstock, provided that quantity shall exceed the amount necessary to carry a second wheel? In other words, can the agreement found by the court to have been made by the plaintiff and Mr. Bell, in the fall of 1854, as to the location and size of the penstock, control the terms of the lease? Of course, in looking at this question we must regard the lease as reformed, and as giving to the plaintiff the right to take water for the second wheel from the canal through the penstock to the Tucker lot. But the court say that the plaintiff is and will be entitled to draw for the supply of his wheel on

the Tucker lot so much water as will run through the penstock. Is that correct? We submit that it is not. The terms of the lease are express. There is to be no more water used than what the flume will hold; and it is not to exceed the quantity necessary to drive two wheels of the size of the one then used. The reformation of the lease, providing that the plaintiff may convey the water through a penstock to the Tucker lot, does not increase the quantity of water that may be used. It simply gives the plaintiff the power to take it to the Tucker lot "through a penstock," and nothing more; and the verbal agreement found by the court to have been made cannot enlarge the grant as contained in the lease. Moreover, there does not appear to have been any legal evidence of authority on the part of Mr. Bell to make any such agreement, and therefore the company cannot be bound by it. It was at best but a parol license subject to revocation.

We submit that the decision of the court upon this point, declaring that the plaintiff is and will be entitled to draw so much water as will run through this penstock as located and constructed in 1854, was erroneous. The whole matter of this penstock is clearly explainable upon the ground that Mr. Bell was attempting to let to the plaintiff a new and further power than what the lease contained, viz., water sufficient to run through the penstock.

II. The second question which we suggest is the first one discussed in the brief of the plaintiff's counsel,—that is, whether the defendants are bound by law to keep their canal of the same dimensions, or to furnish the same head of water at the outlet thereof as was used and enjoyed by the plaintiff at the date of the lease.

The argument of the counsel is this, that the court having found the quantity of water that was then used, "it follows conclusively that the defendants are bound to keep the water in their canal, at the outlet thereof into the plaintiff's flume, at the same height at least it was at the date of the indenture, because in no other way can they furnish through that flume the amount of water they are bound to furnish."

We submit that this argument of the counsel is fallacious. It is not the quantity that was used at the date of the lease that settles the matter, but the rights of the parties under that lease to vary that quantity. And those rights are not left in doubt by any uncertain terms, but are express,—"excepting and reserving to said lessors, however, the control of the water  *   *  at and above said premises, with the right of holding back, and retaining and discharging the water therefrom at their pleasure; an abatement of the rent hereinafter mentioned being made in case said lessors shall be interrupted in the use of said mills thereby." And the covenants of the lessors in the lease were made "subject to the exercise of the right above reserved by said lessors to control the water."

This reservation, we contend, not only settles the question as to the quantity of water that may or may not flow in the canal, but of the power of the defendants to place the obstructions or partition complained of by the plaintiff in the canal.

The object of the company was, to keep all the water within their own complete control, so that they could use it as they pleased and in whatever way they pleased. They were willing and desirous to accommodate parties in the vicinity and about the lake and along the streams which they owned at a very low rent, as was done in this case, whenever and wherever it did not operate to their decided disadvantage; but they designed always to retain to themselves the full and absolute power and control over all the water that they owned. And we maintain that this reservation in the lease not only gives the company the right to place the obstructions complained of in the canal, but to withhold the water entirely if they found that the necessities of their business required it. Their investments connected with and dependent upon these water rights have been very large, and the interests at stake were great, and at the date of the lease they could not foresee to what extent their business and interests might require the use of the water, and hence the reservation was very properly inserted in the lease, and the rent charged very low. And the parties taking it took it with that reservation, running the risk themselves as to what changes might take place, and as to what the defendants might find it necessary to do. And here let it be said, that the defendants have never wantonly or vexatiously interfered with the plaintiff's accommodations in the use of the water; and all they insist upon now is, that, if the plaintiff uses more water or at a different place from what the lease contemplated, he should pay a reasonable compensation for the same. Although they might withhold all the water, under the reservation in the lease, " at their pleasure," they do not now, and have not proposed so to do. What they have placed in the canal they have found it necessary to do for their own protection, and if it reduces the quantity of water specified by the lease, then there must be a corresponding abatement of the rent as therein provided. We submit, therefore, that the company is not bound by law to keep their canal of the same dimensions, or to furnish the same head of water at the outlet thereof as was used and enjoyed by the plaintiff at the date of the lease, and are not bound to remove the partition and obstructions.

III. Was the testimony as to the amount of money expended by the plaintiff competent? It was introduced to show that the lease should be reformed. It was the act of the plaintiff alone, with which the defendants had no concern; and we submit that it was incompetent to affect the terms of the written contract.

IV. All questions upon the bill and answer were reserved, but we propose to consider at this time but one. This lease could not be made without previous authority, expressly delegated by legal vote of the company for that purpose. The fact that Mr. Bell may have been agent for the company for the transaction of all ordinary business, would not authorize and empower him to convey by deed the real estate of the company, or its privileges and appurtenances, or to make a lease like the one under consideration, without special votes giving him authority so to do. No such votes appear to have been shown at the

trial, and in the absence of such evidence the lease of November 2, 1852, and everything done in connection therewith and under the same, would be void,—and if so, than the plaintiff's entire case fails.

V. We are not aware that it has been settled to what extent the findings of the court at a trial term in bills in equity are to go; whether they are to be regarded as final, or subject to be set aside as against evidence, as the verdict of a jury may be. It was unfortunate that the evidence which we desire should be now received was not before the court at the time of the hearing, as we think it could not have failed to have a very important bearing upon the vital question of the reformation of the indenture, as well as to the power of Mr. Bell to make such an indenture. Having strongly the impression that the evidence, if it had been received and considered, would have produced a different result, and being unadvised as to the practice, we venture to move that the finding of the court be set aside as against evidence.

I was not present at the hearing, but, in looking over the testimony as it has been furnished to me, I do not find that any one testifies directly to the point of the reformation of the lease, for the plaintiff, but the plaintiff himself, and his testimony relates to the agreement and understanding between him and Mr. Bell, who died in May, 1857. That testimony should not have been received, or, if received, should have little weight, because Mr. Bell, upon the theory of the plaintiff, was the company, and he being dead, the testimony of the plaintiff comes within the condemnation of the exception to the statute providing that parties may testify.

I also notice by the minutes that this testimony of the plaintiff was expressly contradicted by the defendant's witnesses, one of whom was a party to the lease with the plaintiff.

I also desire to call the attention of the court to the fact that this lease of 1852 is in the plain handwriting of Mr. Bell, without interlineation or erasure; and to the further very important matter of the phraseology of the lease itself, whereby the grant is confined to the drawing of the water " through the flume leading from said canal to the mills and buildings on the premises this day conveyed to them by said company, for the use and operation of their mills and machinery on said premises."

With this explicit statement as to where the water was to be used— on the premises this day conveyed—it is difficult for us to see how the proviso as to the quantity of water to be used can be so changed as to authorize the water for the second wheel to be carried to a different place, and to operate machinery upon a different lot.

With these brief suggestions upon this point, we respectfully submit that the findings of the court should be set aside as against evidence.

*Perley*, on the same side.

I. The necessary parties are not before the court. John A. Cole and John Davis, 2d, were parties to the indenture, entitled under it and bound by it. They and their legal representatives are in express terms

liable to the defendants for the performance of the covenant to pay the rent reserved; and an assignment does not discharge them or their representatives from that covenant. 1 Saund. 241, note 5. They are still liable on their covenant to pay rent, notwithstanding the assignment to this plaintiff. The indenture, after correction of the alleged mistakes, would be a different instrument from that which was executed by John A. Cole and John Davis, 2d, conveying different rights and imposing different liabilities. They could not claim under the new instrument, nor be bound by it, until they became parties to it. There can be no correction which will take from the defendants the security that they have stipulated for in the indenture, nor can John A. Cole and John Davis, 2d, be subjected to that liability, without their being made parties to the bill, and having an opportunity to be heard on the question.

An indenture of lease is not the simple conveyance of an interest in the premises demised, but a mutual contract between the parties, in which they are all interested; and all must be made parties to an application for an alteration in the instrument, which will affect their rights or liabilities. In this case, the payment of rent and the security for it are the substantial and essential part of the contract, so far as it is to be performed on the part of the lessees. It is different in a deed poll of pure donation, where, after a sale by the grantee, neither he nor his heir or executor may have any interest. In that case it may not be necessary to make the grantee after assignment a party; and perhaps in such case the mistake may be corrected and the title established by a mere decree in equity without an actual reformation of the deed. That case is widely different from the present, which falls within the general rule that persons interested must be made parties. Story's Eq. Pl., secs. 72, 167, 169; *Busby* v. *Littlefield*, 31 N. H. 193. In reference to the case of a bill brought after assignment by one of the parties to the original title, Story lays down the rule as follows: "Where the assignment is absolute and unconditional, leaving no equitable interest whatever in the assignee, and the extent and validity of the assignment is not doubted or denied, and there is no remaining liability in the assignor to be affected by the decree, it is not necessary to make the latter a party; but where the assignment is not absolute and unconditional, or the extent or validity of the assignment is disputed or denied, or there are remaining rights or liabilities of the assignor which may be affected by the decree, there he is not only a proper but a necessary party." Story's Eq. Pl., sec. 153.

II. The defendants cannot be enjoined to discontinue or remove the obstructions in the canal.

The bill alleges two mistakes in the indenture.

1. That the verbal bargain, which was intended to be inserted, was "without any agreement or understanding that the right to draw said additional quantity of water was to depend in any degree on the capacity of said flume to discharge water, or that said additional quantity of water should be drawn through said flume."

2. Or, " that it should be used for driving mills or machinery situated on the premises, conveyed as aforesaid by the defendants to the said lessees."

If, then, the indenture was corrected so as to be in conformity with the alleged verbal agreement and the understanding of the parties, it would stand as it now does, except that, as to the second quantity of water, it would not state from what point or in what manner it should be drawn, or where it should be used. All the other stipulations and conditions of the indenture would still apply to the whole rent, the whole quantity of water, and the entire contract of the parties.

The defendants in their answer set forth their large interests in the water-power and reservoirs, from which the water-right demised in the indenture is taken. They allege that what was done by them in the canal was done for the protection of their property, and to enable them to shut off the water from said canal when danger to their property might require it. It was all done, according to the answer, for the purpose of controlling the water " in the Winnipissiogee river and lake, and in the mill-ponds, bays, lakes, and reservoirs at and above the premises demised."

It must be taken that this was done for the purpose and in the manner alleged; otherwise the case reported does not state facts which warrant a decree. If, then, the supply of water has been diminished by the change made in the canal, the deficiency has been caused by the control which the defendants have exercised over the water. They have controlled the water by changes made for the protection of their property against danger from the action of the water.

This the defendants had a clear right to do, by the express terms of the indenture under which the plaintiff claims. The language of the indenture is as follows: " Excepting and reserving to the said lessors, however, the control of the water in the Winnipissiogee river and lake, and in all mill-ponds, bays, lakes, and reservoirs at and above said premises." The right to control the water is reserved, in the broadest and most unqualified terms. It has no limitation but the discretion of the defendants. The right may be exercised by any reasonable and suitable means; and no means could be more reasonable and suitable for that purpose than regulating the flow of the water in the canal. The defendants, by what they have done in the canal, have infringed on no right granted by the indenture, but have done it in the lawful exercise of a right expressly reserved thereby.

The parties to the indenture must have foreseen and understood that the exercise of this right to control the water would be likely to diminish the quantity and interrupt the use of the water demised; and they provided for such a case by stipulating that the remedy of the lessees should be by an abatement of the rent,—" an abatement of the rent hereinafter mentioned being made in case said lessees shall be interrupted in the use of said mills thereby." This is the only remedy of the lessees for a damage caused by the exercise of the right to control the water. They cannot maintain an action to recover damages

for the interruption of their mills by the exercise of this right; much less can they ask a court of equity to prohibit the defendants from exercising and enjoying a right expressly reserved to them in the indenture itself.

It is hardly necessary to cite authorities in so clear a case; but one recent and controlling authority is so directly in point, that it may be excusable to mention it, and that is the case of *Sheets* v. *Selden*, in the supreme court of the United States, 7 Wall. 416. The doctrine of the case, as stated in the head note, is as follows : " Where a water lease provided for an abatement of the rent if there should be any deficiency in the supply of water, it was held that equity would give no other remedy for such deficiency." SWAYNE, J., in delivering the opinion of the court, says,—" In the leases set out in the bill, the parties provided but one remedy for a failure of water, that is, an abatement of the rent in proportion to the extent of the deficiency. The contract gives none other. The court cannot interpolate what the contract does not contain. The appellant is entitled to the remedy specified: neither a court of equity nor a court of law can give him any other." *Sheets* v. *Selden*, in all the material circumstances, would seem to be identical with the present case, and is a decisive authority that the only remedy of the plaintiff for a damage caused by the obstructions in the canal is that provided by the indenture,—that is to say, an abatement of the rent.

This question does not depend at all on the extent of the estate demised by the indenture. Even if it could be taken to be a conveyance of the water right in fee-simple with the reservation of fee farm or perpetual rent, the defendants would still have the corresponding perpetual right to control the water; and the only remedy of the lessees would be an abatement of the rent, if at any future time damage should be caused by the control of the water.

But this was not the conveyance of a fee-simple with a reservation of a perpetual rent.

To create or convey an estate in fee-simple, the word *heirs*, or at least the word *heir*, is necessary. It is not enough that other expressions are used which show an intention to part with the whole property in the thing conveyed. If the word *heirs* or *heir* is not used, whatever other terms are employed in a deed, no larger estate passes than an estate for the life of the grantee. This is one of the best established and most familiar canons of the common law, and as such is adopted as part of the law in this state, and is quite familiar to all who are employed in drafting deeds or other instruments relating to real property. There is nothing in the constitution or legislation of the state which shows an inclination to abolish or relax the rule. On the contrary, the intention to retain the rule in its integrity is strongly implied from the fact that the rule has been changed by statute in respect to devises, but in the several revisions of the law has been left untouched in reference to deeds and conveyances. Statute of July 2, 1822; Rev. Stats., ch. 156, sec. 4; Gen. Stats., ch. 174, sec. 4.

The rule is laid down by Washburn as follows: " Though it has obviously become a mere arbitrary rule, still, unless changed by statute, it is as imperative as a rule of law now as ever.  No synonym will supply its place."  Washb. on Real Prop. 56, sec. 53, 3d ed. And in the application of the rule to a demise reserving rent, the same author says,—" To constitute a fee-simple the rent must be reserved to the grantor, his heirs and assigns, or, if granted, by like words of inheritance."   2 Washb. 253, sec. 8.   In Greenleaf's note to 4 Cruise 277, sec. 1, he says,—" This rule is still in force in the United States, except where it has been changed by statute."  S. P., 4 Kent's Com. 5 ; *Clearwater* v. *Rose,* 1 Blackf. 137 ; *Adams* v. *Ross,* 1 Vroom 505 ; *Sedgwick* v. *Laplin,* 10 Allen 430.  Wherever the common law prevails in this country, this rule has been adopted and applied without relaxation, unless abolished or modified by statute.   It is believed that there is no case to the contrary, though *Stevens* v. *Dewing,* 2 Vt. 411, has been sometimes cited as an exception, standing on peculiar grounds. But that case, it will appear on examination, is no exception.   The lease in that case was " to Martin [the lessee] and his heirs," to hold for the full term of one thousand years, or as long as wood grows and water runs.   The word " heirs," the proper term to convey a fee-simple, was used in the habendum; and the real question was, whether the added words cut down the estate from a fee-simple to an estate for years, when in fact the added words were only a quaint way of saying that the estate was to be held by Martin and his heirs forever.

This rule applies to the conveyance of real property for a consideration apparently of equal value to the fee-simple, and where the grantor reserves no right issuing out of the premises conveyed, though a clear intention is expressed to part with the whole interest in the property conveyed, and though there might be great hardship in asserting the rule contrary to the intention so expressed ; but the present is widely different from such a case.   No such intention is expressed, and no such intention can be inferred from the nature and circumstances of the transaction.

The conveyance of any property, even a well-defined tract of land, in fee-simple, with the reservation of a perpetual rent, if lawful, is an inconvenient transaction, repugnant to the condition of things in this country, and absolutely unknown in practice.  No man in this state would think of buying property subject to the perpetual incumbrance of a quarterly rent ; and just as little would any one think of selling property, relying for the consideration on a perpetual quarterly payment of rent.   If there was an intention to create an estate so inconvenient and so unusual, we should certainly expect the intention to be expressed very plainly and in the most formal technical language.

The nature of the interest demised, and the manner of defining it, tend to show that the demise could not have been intended to be perpetual.   It is not to be supposed that the defendants would be guilty of such imprudence as to convey away an absolute and perpetual right which might seriously interfere with the use and management of their

water-power and reservoirs. Then again, the description of the right, and the means provided for ascertaining the extent of it, show that it was understood not to be perpetual. The quantity of water to be taken is " not to exceed a sufficient supply for driving the water-wheel at present used by said lessees, and one other water-wheel requiring an equal quantity of water." The lessees might change the wheel and the kind of wheel at their pleasure, and in all future time there would be no means of measuring the extent of their right but by evidence of the quantity of water sufficient to drive the wheel in use at the date of the indenture. And the water is to be taken, at least for one of the quantities, from an existing flume, which, though it might be repaired, could not be changed in situation or substantial character.

There is nothing in the nature of the right demised, in the consideration for the demise, in the manner of defining it, or the way in which it is to be taken, that shows an intention to create a fee-simple, but the contrary.

The language used in the indenture and the several provisions of it show no such intention, but are entirely decisive to show that there could have been no such intention.

In the operative words, which convey the estate demised, the demise is to John A. Cole, Benjamin J. Cole, and John Davis, 2d. The demise is to them personally, not to them and their heirs, to them, their executors and administrators, nor even to them and their assigns. The familiar terms so well understood, not only by lawyers but by all persons of common intelligence, as necessary to create or convey an estate in fee, are wholly omitted in the operative words of the indenture, from which the inference is clear that there was no intention to convey a fee-simple.

But the habendum is the part of a deed the peculiar office of which is to determine the quantity of estate conveyed. The grantee is to have and to hold the premises for the time and the term stated in the habendum. The lessees in this case hold to them, not to them and their heirs, or to them and their assigns; and they hold " for and during their pleasure." This, then, is an estate at will, at least on the part of the lessees. They may end the estate at their pleasure. The estate of tenant at will cannot be assigned. An attempt by the tenant to convey terminates the estate. Woodfall's Landlord and Tenant 182. In a tenancy at will, the demise is to the lessee personally; no interest passes to his executor, heir, or assignee. It was doubtless by design that all mention of heirs, assigns, etc., was omitted in this indenture, for such expressions would be inconsistent with an estate held at the will of the lessees.

There is nothing to the contrary in any other part of the indenture. The agreement that the covenants and agreements therein contained should extend to and bind the legal representatives of the parties has no relation to the quantity of estate demised. It is difficult to conjecture who the legal representatives of this corporation aggregate would be, that could be made liable to the covenants of this indenture. They

could have no heirs, or executors, nor any successors, who would be personally bound by these covenants. And the agreement, if intended to bind the heirs and executors of the lessees to the performance of their covenant to pay the quarterly rent, would apply with far more propriety to a temporary estate at will than to a fee-simple. If the estate were to continue forever, the liability of the lessee's heirs on the covenant to pay the perpetual rent would be a poor security. But if the estate could last no longer than for the lives of the lessees, there would be some sense in providing that their heirs and executors on their death should be bound to pay the rent which they in their lifetime had allowed to fall in arrears. And the rent might as well be in arrears, and the covenant to pay it be broken by the lessees at will, as by the lessees in a lease for any longer term.

This, we submit, is not an estate in fee, because, in the first place, the necessary terms are not used to create such an estate; and, also, because neither the provisions of the indenture, nor the nature and circumstances of the transaction, show an intention to create a fee. The court, therefore, are not called on to perform the unpleasant duty of enforcing a rigid general rule of law against the apparent intention of the parties and the justice of the individual case. The estate cannot last longer than the lives of the lessees, and during their lives it is an estate at will.

The tenancy is clearly at the will of the lessees. They hold " for and during their pleasure." They may end the lease at their pleasure. They are not bound to take the water and pay the rent longer than they please. It is not reasonable that one party should be bound by a contract, and the other party should be at liberty to discharge himself from it at his pleasure; and when a lease is at the will of one party, it is, in law, at the will of the other. The law on this point is laid down in Co. Lit. 55, a, as follows: " Every lease at will must, in law, be at the will of both parties; and, therefore, when the lease is made to hold at the will of the lessor, the law implieth it to be at the will of the lessee also; for it cannot be at the will of the lessor, but it must be at the will of the lessee also;—and so it is when the lease is made to hold at the will of the lessee; this must be also at the will of the lessor." S. P., 4 Kent's Com. 109. Here the lease is to hold at the pleasure of the lessees. The lease is, therefore, by this rule, at the pleasure of the lessors also. If a man lease land for such a term as both shall please, this is but a lease at will. Bacon's Ab., Leases (L.) 3.

The case does not require us to deny that one party may, by express stipulation, have power to terminate a lease at his pleasure without conceding the same right to the other party. But these lessees have stipulated for no such unusual, unreasonable, and inequitable right; and the rule of law, that where the lease is at the will of one party, it is also, by legal implication, at the will of the other, applies in full force. It is not to be supposed that the defendants would be guilty of the improvidence and egregious folly of binding themselves to a conveyance of this water right in fee with the reservation of a perpetual

rent, and leaving it to the lessees to end the lease at their pleasure, without reserving the same right to themselves.

The right, however, of the lessors to terminate this lease at their pleasure, is not left to legal implication, from the fact that the lessees have that right. The acts which they reserve the right to do at their pleasure, if exercised in their full extent, would take from the lessees the water right demised, and so end the lease.

They reserve the right to control the water in the lake, etc.,—that is one thing; and they also reserve the right of "holding back and retaining the water at their pleasure," which is quite another thing. This right is absolute, "at their pleasure." The lessees cannot require them to explain why they do it. There is no limitation of time or quantity to their exercise of the right. They may detain as much of the water as they please, when they please, and as long as they please. The thing demised is the water taken under the lease. If the lessors detain and keep back the water in their reservoirs, they withhold the thing demised from the lessees, and resume the possession, turning the lessees out of the possession and enjoyment of it, as much as if this were a demise of land, and the lessors entered and evicted the lessees; and the effect on the term must be the same,—that is to say, the term is ended. And this is the appropriate and perhaps the only way for the lessor of a lease at will to exercise his right of putting an end to the estate at will.

This construction of the indenture makes the transaction consistent and reasonable on all hands and for both the parties. It would not be reasonable for the defendants to grant a perpetual right, nor anything more than a defeasible right to take water, that might interfere seriously with the safety, the use, and the management of their water-power and reservoirs, and therefore common prudence would require them to reserve the right to end the lease at their pleasure. On the other hand, if the supply of water was diminished or interrupted by the control which the defendants might exercise over the water, it would not be reasonable to require that the lessees should keep what might be left, and what might not answer their purpose on an abatement of the rent.

It is material to bear in mind that parties to a lease at will cannot exercise their right to terminate the lease without reasonable notice. If the lessees in this case elected to end the lease, they would be required to give reasonable notice. And if the lessors elected to detain and shut off the water, and so end the lease, they would by the general rule be required to give due notice. They could not do it immediately while the lessees paid the rent promptly. Hence the necessity for the provision that the lessors may shut off the water immediately, if the rent is not paid in time. 4 Kent's Com. 111.

*Mugridge*, for the plaintiff.

The bill can properly be maintained by the plaintiff alone, without a joinder of any other parties.

John A. Cole and Davis need not necessarily have been joined as plaintiffs, upon the ground merely that they were parties to the original indenture.    Story's Eq. Pl. 166, note 1.

They have no concern in this suit, no material interest of theirs is to be affected by it, and no order or decree that the court can make, under any prayer of the bill, can conclude any rights belonging to them in the lease, for all their rights and interest had, long before the filing of the bill, been transferred to the plaintiff, who alone was beneficially interested in the matter.

If it is reformed, so that the right to draw water shall be secured to the parties, according to the verbal understanding which existed when it was made, the defendants would have no enlarged claims against the lessees for rent, and no new liabilities of any kind would attach to them, but, in the language of counsel in their brief, " it would stand as it now does, except that, as to the second quantity of water, it would not state from what point or in what manner it should be drawn, or where it should be used. All the other stipulations and conditions of the indenture would still apply to the whole rent, the whole quantity of water, and the entire contract of the parties."

If they were joined they would at most be mere nominal parties; and the rule as stated is, " that, wherever the court can see in the particular case that there is no necessity of the joinder of the assignor in order to conclude his rights, it will not be required, especially after the case has gone to a hearing."    Story's Eq. Pl., sec. 153; *Day* v. *Cummings*, 19 Vt. 496 ; *McConnell* v. *McConnell*, 11 Vt. 290.

II. The plaintiff alleges in his bill, in statements numbered from twenty-five to twenty-seven, that certain obstructions have been by the defendants placed in the canal, which have had a tendency to diminish the quantity of water as the same was flowing through said canal at the time of making the lease; and the court find these allegations to be true.

In the brief furnished by Judge Perley, the attempt is made to justify the company in doing the acts in question entirely upon the assumption that "it was all done, according to the answer, for the purpose of controlling the water in the Winnipissiogee river and lake, and in the mill-ponds, bays, lakes, and reservoirs at and above the premises demised," and that, by doing what they " have done in the canal, they have infringed on no right granted in the indenture, but have done it in the lawful exercise of a right expressly reserved thereby."

His whole argument is based upon the ground that, when the defendants say in their answer that the obstructions were put into the canal for the " protection and safety of all said mill property at Lake Village and on said river below," and " to shut off the water from the canal when danger should require," it is to be assumed and " must be taken " by the court that this was done by the defendants as an act of legitimate and proper control on their part of the water of the river, &c., under the reservation to them contained in the lease ; and it is upon

these assumed premises that his argument is made and all his inferences and conclusions against the plaintiff are drawn.

The correctness of this proposition we deny, and say that a fair and natural interpretation of the answer excludes this idea, and shows clearly that the defendants intended to defend against the putting in of the partition, timber, stone, and other material by which the passage of the water was hindered, upon another and an entirely different and independent ground, viz., that they were needed as barriers and protections to certain dams, mills, and other specific property belonging to them, when danger should require.

It is easy to see that acts of the defendants for the protection of their property may be of such a character as to be entirely improper and wrongful as against the plaintiff, and that they may be entirely distinguishable from a regulation and control of the waters of the river and lake, by holding back, retaining, and discharging the same by such suitable means and in such a reasonable manner as was contemplated by the parties and provided for in the lease.

The precise question to be determined by the court on this branch of the case is, whether the company " was bound in law to keep their canal of the same dimensions, or to furnish the same head of water at the outlet thereof, as were used and enjoyed by the plaintiff at the date of said indenture;" and if this is determined to be so, then the order of the court is, that the obstruction be removed.

By the terms of the indenture, a right to draw a given quantity of water was leased to the plaintiff, subject to certain conditions contained in the lease, for and during their pleasure; and by its terms, all the covenants and agreements contained therein were made to extend to and bind the parties and their legal representatives.

Much research and learning has been expended by the counsel on the other side to characterize the indenture and define the extent of the estate thereby demised, but we are at a loss to see its importance as tending to determine and settle the exact and precise question submitted to the court, as stated in the printed case.

Suppose the tenancy is at will, as is claimed on the other side, the lessees to " hold for and during their pleasure," to be terminated when they may so elect, and that the same right to terminate the lease exists upon the part of the lessors as is given to the lessees, as is claimed by counsel: there can be no pretence but what the same tenancy existed with full force and obligation between the parties at the time of putting in the obstructions complained of, and at the time of the filing of the bill, as when the indenture was made, for no act upon the part of either party is shown, since the date of the indenture, in the direction of terminating it; so that in this view of the case, conceding only for the purposes of the argument that the estate was no higher in degree than a tenancy at will, even then, while that tenancy existed and until it was legally terminated under the covenants and agreements contained in the indenture, the lessors would be legally bound to supply the quantity of water claimed by the plaintiff, and which the court find has been withheld, as charged in the bill.

But we contend that the estate in the lessees is not limited to a mere tenancy at will, but that the lease is to be regarded as perpetual, only liable to be terminated by the lessors upon the default of the lessees in the performance of the agreements, or the observance of the conditions therein mentioned.

In determining the quantity of estate passing by the lease, the intention of the parties gathered from a view of the whole agreement is to be the criterion by which the court will give a construction to the instrument, giving an effect to the whole of it if it can consistently and reasonably be done; and if any uncertainty or ambiguity exists in determining the language of the grant, it is to be interpreted most favorably to the grantee—*Cocheco Manf. Co.* v. *Whittier*, 10 N. H. 311; and this principle has been applied to the construction of leases. *Webb* v. *Dixon*, 9 East 15; Woodfall's Landlord and Tenant 110. That it was the understanding of the parties that the rights granted and received under the indenture in question were intended to be perpetual, is, we assert, perfectly apparent and beyond controversy.

It is suggested by counsel on the other side, that no estate in fee-simple has been conveyed, because the word "heirs" is not used in the instrument, and that no estate in fee can exist without the use of this word in the grant; and that this rule of law is so unvarying and inexorable in its character, that no synonym whatever will supply the place of the word itself.

We know that text-books allude to some such old rule as this, but it seems to be spoken of and regarded as a kind of relic of feudal strictness—2 Black. Com. 107; Willard on Real Estate and Conveyancing 50—and as being based on principles of feudal policy which no longer exist, so that as a rule of to-day it is to be considered as "entirely technical," and one that "has for a long time been controlled by a more liberal policy." 4 Kent 6. Many cases are alluded to by authors, where the arbitrary and technical character of this rigorous old rule, as it formerly existed, has been relaxed. 4 Kent 7; 1 Washb. on Real Prop. (ed. 1860) 57, 58, 59. We have not been able to find any case in New Hampshire where it has been applied, and are inclined to think that a court of equity in this state will hesitate, when asked, as in this case, to conclude parties with reference to important rights, under an unreasonable and senseless rule which has outlived its usefulness, if it ever had any, simply and only because they have not used certain specified and favored words or phrases in defining their rights; and will refuse to do so altogether, if, by other and equally intelligible terms that are used by the parties, the right intended to be conveyed clearly appears. The court will not cavil with parties as to the form of words adopted by them in defining and describing their rights, so be it that they are made clear and certain. It is their intention that is sought after; for when this is clearly ascertained it is always controlling, and the construction of the deed or lease will depend far less upon artificial and technical rules, than upon the application of good sense and sound equity to the object and spirit of the contract in each particular case. Taylor's Landlord and Tenant 158, 161.

As we have before stated, we maintain that it was clearly intended by the lease in question, that the rights to the water-power demised were to be perpetual in their character; that they were to be insured and guaranteed to the lessees for and during the length of time that it might be their pleasure to have and hold them, upon the payment of the annual rents and the other conditions mentioned therein; and that all of the rights conferred upon the lessees and their entire estate in the demised premises were conferred upon and extended to their " legal representatives "—heirs—by the express agreement of the parties.

It is assumed by counsel on the other side, that the " agreement that the covenants and agreements therein contained should extend to and bind the legal representatives of the parties, has no relation to the quantity of estate demised;" but we say there is no ground for any such distinction and exclusion.

The agreements contained in the premises when the estate is granted, and in the habendum where its certainty is limited and defined, are just as material and essential as any other of the agreements or covenants contained in the lease, and the " agreements " referred to may as well apply to them as to any other portions of the indenture, so far as any legal objection is concerned, and there is certainly nothing in the instrument to show that they were exempted by any act or intention of the parties.

It is said that the lessors could have no " legal representatives " that could be made liable to the covenants and agreements of this indenture; but this suggestion can have no force, for in legal contemplation, being a corporation, they are to live forever, being immortal by means of perpetual succession.    4 Kent 7.

But it is said that the " nature and circumstances of the transaction " do not show any intention to create a fee.    We deny this, and claim that the acts of Mr. Bell, as agent of the company, in locating the penstock with reference to a permanent use of the water from the canal, the long acquiescence of the company in the plaintiff's claim of right to use and actual use of said water, the large expenditures of money in the erection of permanent and expensive buildings and supplying the same with costly machinery, the other outlays as charged in the bill, together with all the other acts and conduct of the parties as seen in this case since the date of said lease, are entirely opposed to the idea that the lessees ever understood that they were absolutely in the hands of the lessors, with an estate which was a mere tenancy at will, liable to be terminated at any time when the caprice of the lessors might dictate it, and are only reconcilable with the idea that the rights given and received were intended by the parties to be lasting in their character.

Again: counsel for the defendants claim that the estate under this lease, being a mere tenancy at will, exists only in the lessees; that the right is purely personal, to be enjoyed by them alone, and that it cannot be transferred or assigned to another person.

Will the court for a moment entertain the idea that the plaintiff ever understood this to be so, and that he was "guilty of the improvidence and egregious folly" of making the large and permanent investments in shops and machinery which have been made by him, with the full knowledge that the water rights, which alone gave such investments their value, were purely of a personal character, which he alone might enjoy, but which could never be sold or conveyed with the shops? and did the Lake Company understand when the lease was made that the lessees were being bound to any such absurdity? Did the parties ever intend to create a tenancy and estate of such a transitory and ephemeral character as that claimed by the defendants? or, is it more reasonable to say that their meaning was, to give the lessees that power of alienation which attaches and is an inseparable incident to a lease in fee with a reservation of annual rents, such as we claim their title to be?

We do not understand that it is seriously contended that there is any legal objection to the form of conveyance which we claim to exist between the parties in this case; we find no authority for such a position, if it is to be taken. It is quite clear that it has long been known to the law, and its validity has been fully recognized and established. Taylor's Landlord and Tenant, secs. 370, 371; 2 Washb. on Real Prop. 7. Such a lease was under consideration in *Worster* v. *Company*, 41 N. H. 18, *Scott* v. *Lunt*, 7 Pet. 602, *Jackson* v. *Allen*, 3 Cow. 231, and in other cases that might be cited.

This form of lease is assignable—*Spear* v. *Fuller*, 8 N. H. 174; and the liability of the lessees on their covenant to pay rent will not be impaired or in any manner affected by the assignment. Such covenants run with the land, and, in case of the tenant's alienation, afford the landlord a double claim for the payment of his rent, the assignee being chargeable in consequence of his privity of estate, and the lessees still continuing bound in respect to the contract. Taylor's Landlord and Tenant, sec. 371; *Van Rensselaer* v. *Hays*, 19 N. Y. 68.

*Fowler*, on the same side.

I. As to the application to have new evidence received.

1. The request to have the court receive new evidence, after a full trial, argument, and decision of the cause, is wholly unprecedented and unjustifiable. It is admitted that this evidence was fully known to the defendants and their counsel; yet the trial was had, the case argued and submitted, and the defendants deliberately took the chances of a finding of the court; and that finding being against them, it is too late for them to ask to have evidence, fully within their knowledge and control at the time of the trial, received and considered. Should this request be granted, and another finding be had against them, they might with equal propriety ask to have other and further evidence received, and so on indefinitely, as long as their wealth could procure attorneys to pursue the matter. The plaintiff protests against such a course of

proceeding. A full and fair trial was had; the court made their finding, and that should forever end the case, so far as the reception of evidence is concerned.

2. The vote of November 21, 1846, does not apply to the water-power leased to the plaintiff, inasmuch as that vote is restricted to unoccupied water-power, and that conveyed to the plaintiff in 1852 had long been occupied and used.

3. The vote of November 21, 1846, is inadmissible against the plaintiff, being a private record of the corporation exclusively within the knowledge of the defendants, who held out James Bell as their general agent, and for nearly twenty years recognized his acts in making the lease to the plaintiff, by receiving rents under that lease, and permitting the plaintiff to occupy and make large expenditures in connection therewith. The defendants are estopped by their acts to deny that Mr. Bell was authorized to make the lease as he did, and are not at liberty to offer evidence tending to impeach his authority. *Bank of U. S.* v. *Dandridge,* 12 Wheat. 83.

4. The defendants, in their answer, expressly admit that the lease to the plaintiff was their deed; and having so admitted it, they are estopped to deny that their agent had authority to make and execute it.

5. The vote of November 21, 1846, only applied to their then acting agent; and the records showing that Mr. Bell was appointed agent from year to year, it could not and did not apply to him when acting under reappointments as general agent, with unrestricted powers. In other words, any limitation of Mr. Bell's powers as agent in 1846 would not bind him under his general and unrestricted appointment as agent in 1852, after he had been reappointed six times as general agent with unrestricted powers.

6. The lease to the *Boston, Concord & Montreal Railroad,* February 27, 1852, which has been recognized as valid and binding by the defendants for more than twenty years, and is in terms, like that to the plaintiff, during the pleasure of the lessees, shows clearly that neither Mr. Bell nor the defendants then, or ever since, understood the vote of November 21, 1846, restricted or limited Mr. Bell, as agent of the defendants, to making a lease for ten years or less.

7. The vote of the defendants, June 30, 1852, authorizing their agent to convey such portions of their real estate as were not required for the purposes for which it was purchased, expressly authorized Mr. Bell to make the conveyance and lease he did make to the plaintiff. A pool, pond, stream, or watercourse is a part of the land, and would pass by a grant of the land. 2 Bouv. L. Dict., Water, 646; *Bullen* v. *Runnels,* 2 N. H. 255; 1 Wend. 255; 5 Paige 141; *Claremont* v. *Carleton,* 2 N. H. 371; *Tyler* v. *Wilkinson,* 4 Mason 397. Indeed, that a stream of water is part of the land, and therefore real estate, is too elementary to need any citation of authorities. The canal or stream of water at Lake Village, therefore, being real estate of the defendants, the vote of June 30, 1852, authorizing their agent to convey such portions of their real estate as were not required for the purposes for

which it was purchased, of which requirement the agent was to be sole judge, expressly authorized Mr. Bell to convey any portion of their land and of their water, which he deemed not necessary for the purposes of its original purchase by the defendants. Mr. Bell, therefore, having express authority so to do, did convey not only the land described in the deed of November 23, 1852, to the plaintiff and his associates, but also the water-power connected therewith, described in the lease to them of the same date; for the lease is and was intended to be just as much a conveyance as the deed. The chief justice, who tried the case, will remember that it was proved on the trial, and not controverted, that Mr. Bell's proposition was, to give the plaintiff and his associates an absolute deed of the water-power for $2,300, or a perpetual lease thereof for an annual rent of $150; and that the latter mode of conveyance was finally adopted, because the plaintiff preferred to pay an annual rent greater than interest on the purchase-money, rather than advance the purchase-money. That both parties understood the lease to be a conveyance of real estate is shown by its provisions being made applicable to the legal representatives of both parties, and by its being acknowledged and recorded as a deed in the county registry. The defendants, then, having on June 30, 1852, expressly authorized their agent to convey such portion of their water-power at Lake Village as he deemed it unnecessary to retain for the purposes of the defendants, and that agent having made the conveyance by a lease perpetual at the pleasure of the lessees and their legal representatives, that conveyance being admitted by the defendants in their answer to be their deed, and they having recognized its validity for nearly twenty years by receiving the annual rents therein stipulated, it does seem that only a soulless corporation would attempt to repudiate and avoid a conveyance so made and recognized.

8. The extract from Mr. Bell's private diary, made in the absence and without the knowledge of the plaintiff, is clearly inadmissible for the purpose of controlling or in any way affecting the contract of the parties. To us it seems entirely consistent with the plaintiff's account of the transaction, to which it relates.

II. As to the construction to be given to the lease.

We say the lease is and was intended to be a conveyance in fee of the premises described therein to the plaintiff and his associates, their heirs and assigns, if they should elect to pay the annual rent stipulated for. It is true, the grant is not in terms made to the lessees, their heirs and assigns; but we contend that the agreement of the parties at the close of the lease, " that all the covenants and agreements herein contained shall extend to and bind their legal representatives," was intended to be and is tantamount to such a grant; for, by the legal representatives of the lessees, in such a perpetual lease of real estate, can only be understood those who may represent or stand in the place of the lessees, as their assignees in case they should sell or convey their interest therein, their heirs-at-law in case they should die intestate, or their devisees in case they should dispose of their interest therein by

will. Such we understand to be the well-settled construction of the phrase "legal representatives," when used in connection with covenants or conveyances or devises relating to real estate. 2 Bouv. L. Dict., Representative, Representation, 461 ; Bacon's Abr., Heir and Ancestor, A ; 2 Wm.'s Exec. 820–832 ; *Jennings* v. *Gallimore*, 3 Ves. 146 ; *Long* v. *Blackall*, 3 Ves. 486 ;—see note to *Jennings* v. *Gallimore*, 3 Ves. 148 (Sumner's ed.) ; *Bridge* v. *Abbot*, 3 Brown's Ch. (Perkins's ed.), 187, *226, notes and authorities ; *Maybank* v. *Brooks*, 1 Brown's Ch. (Perkins's ed.), 76, *84, notes and authorities. These cases all show that the court will construe the phrase so as to carry out the intention of the parties.

If the court shall be of opinion that the lease as it stands is not to be construed as a perpetual lease at the pleasure of the lessees, their heirs and assigns, then the plaintiff asks leave to amend his bill so as to pray that the lease may be reformed so as to express the agreement and intention of the parties in that respect.

*LADD, J. The first objection is, that the necessary parties were not before the court in the outset ; that John A. Cole and John Davis, 2d, being parties to the indenture, ought to have been made parties to the bill.

We think this objection cannot prevail. The case shows that Davis, for a valuable consideration, transferred and assigned to the plaintiff all his right, title, and interest in the indenture, December 18, 1856 ; and J. A. Cole in the same manner assigned his interest therein to the plaintiff, September 9, 1857. This shows conclusively that neither Davis nor J. A. Cole now have any interest, either legal or beneficial, in the subject-matter or the object of the suit, and are not to be affected in any way by the event. If they or their representatives are liable for the payment of rent upon their covenant in the lease, that liability will remain unchanged and unaffected by any decree that can be made upon this bill, which is brought to reform the instrument in a particular in no way connected with the amount of the rent, or the times and mode of its payment ;—that they are not necessary parties is therefore clear, and, for the reasons given above, we think there is no ground for requiring them to come in. Story's Eq. Pl., sec. 153 ; *Day* v. *Cummings*, 19 Vt. 496.

At the argument of the exceptions before the whole court, the defendants moved to dismiss the bill for the reason that there has been an assignment of the lease *pendente lite*, and proof has been offered upon this motion from which it may be assumed that the fact is so. But we think the motion must be overruled. The *lis pendens* is a sufficient notice to the assignees of the plaintiff, and they will be bound by the decree. Story's Eq. Pl., sec. 156, and cases in note.

The defendants move that certain evidence received *de bene esse* by the judge who tried the cause, under circumstances shown by an amendment to the case, be considered here, and that the findings of fact upon

---

*HIBBARD, J., having been of counsel, did not sit.

which a reformation of the lease was ordered be set aside or modified, and the order reversed.

We do not think the affidavit of Mr. French, when considered in connection with the facts respecting the introduction of this evidence as stated in the amendment, shows sufficient ground for reopening the case. Counsel as well as parties must be held to some reasonable degree of diligence in such matters, otherwise the court will find it impossible to get through with the business required of them. We cannot consider and weigh evidence at the law terms in determining questions of law reserved in equity any more than at law. How it would be as to setting aside findings of fact by a judge at the trial term as being against evidence or as unsupported by evidence it is not necessary to inquire, because no such question is here reserved, and the evidence upon which the findings were based is not before us. In order, however, that the defendants may not feel that their rights have suffered by reason of this omission, we may say, informally, that we have read the evidence in question without being able to discover its importance, and so far as we can get any light from an attentive examination of the whole case, and the printed and oral arguments of counsel upon this point, we all concur with the chief justice, who tried the cause, in the opinion that the material findings of fact ought not to be changed or affected by the evidence, were it received.

We are unable to attach the least weight to the fact that a similar lease was made to the B., C. & M. Railroad a few months before, and the memorandum of Mr. Bell shows absolutely nothing, except what appears from an inspection of the two documents, namely, that they are similar.

As to the votes of the corporation, if that of November 21, 1846, were considered, that of June 30, 1852, would also be considered, and we should still be of opinion that the lease was not executed by Mr. Bell on behalf of the company without sufficient authority to bind them in the premises.

We think the order for a reformation of the lease, upon the facts found, was right. It is therefore to be affirmed, and a decree entered accordingly.

As to the finding by which the amount of water the plaintiff may draw for the supply of his wheel on the Tucker lot is fixed, the defendants object that any parol agreement entered into by Mr. Bell on that subject cannot be received to change the terms of the lease; and that is so beyond question. It is not objected, however, that upon this bill the measure of the quantity of water to be taken for that purpose to answer the terms of the lease may not be ascertained and fixed. This is all the court undertook to do, and in doing it received evidence that a certain definite measure was agreed upon by the parties soon after the execution of the lease. If this act of Mr. Bell be regarded merely as a piece of evidence bearing upon the size of a penstock that should have the capacity to draw the quantity of water called for by the lease, it would doubtless be entitled to very considerable weight, in that view

alone ; but it seems to have been something more, namely, a practical application of the instrument to the thing conveyed, by which the parties may well be considered bound,—something like a practical location of a piece of land conveyed by deed, where the parties, immediately after the execution of the deed, go upon the ground and establish its boundaries by fixed and definite monuments not inconsistent with the calls of the deed.   We see no reason why a decree fixing the quantity of water the plaintiff may draw for use on the Tucker lot, under the lease as amended, should not be entered in accordance with this finding.   It is no more than prescribing an instrument and mode whereby the quantity required to drive a wheel like that used by the lessees at the time of executing the lease shall be measured and ascertained.

The bill prays for an order that the defendants remove from the canal certain obstructions placed by them therein, and an injunction restraining them from filling up the channel of the canal, or doing any act to prevent the water from freely flowing therein ; and this raises what seems to be regarded as the important question in the case.

The respective rights and obligations of the parties rest upon the true construction of the lease as reformed.   It is contended by the defendants that this lease creates a simple tenancy at will in the lessees, determinable at the pleasure of either party ; and that this is shown (1) by the express reservation contained in it, and (2) by the fact that it is made determinable at the will of the lessees.

Upon a careful examination of the reservation, in connection with the rest of the instrument, we think it will not bear the construction which the defendants claim for it.   The reservation is, " the control of the water in the Winnipissiogee river, and in all mill-ponds, bays, lakes, and reservoirs at and above said premises, with the right of holding back and retaining and discharging the water therefrom at their pleasure."   The question is, whether this gives the grantors the right to cut off or interfere with the flow of water from their dam into and through this canal by any special means or appliance independent of their general control and management of the water in the river, lake, &c.   In giving construction to this reservation we are to look at the whole lease together, as well as the subject-matter to which it relates.

The right granted is, to draw a certain quantity of water from the canal leading from the Lyford saw-mill connected with the dam of said company, &c., and the defendants covenant that they will keep said dam in repair so as to afford the use of the water as aforesaid, subject to the exercise of the right reserved by said lessors to control the water.   It is also stipulated, that in case the lessees are *interrupted* in the use of their mills by the acts of the defendants, in holding back, retaining, and discharging the water, there shall be an abatement of rent for that cause.   Are these various provisions of the lease consistent with the idea that the defendants might at any time, at their mere pleasure, and for a purpose in no way connected with the exercise of a general control of the water in the river, lake, &c., put in a permanent

barrier at the head of the canal, and so, by cutting off entirely the flow of water therein, terminate the lease ?   We think they are not.   Why a covenant that the defendants should keep their dam in repair so as to afford the use of the water, unless the state and flow of water in the canal were to depend on the state of the water in the dam ?   Why the provision that, in case the lessees fail to perform on their part, the lessors may immediately, or at any time thereafter while said neglect or default continues, shut off the water and prevent its flowing through said flume, if it was understood that such right existed whether the lessees performed the covenants or not ?   Observe, also, that this very provision is expressly limited by the significant phrase, " while said neglect or default continues."   Why does the instrument speak of an abatement of rent in case of *interruption,* unless the intention were to provide for those occasions when the defendants' general management of the water, for the benefit of their large interests said to be involved, might disenable them, *temporarily,* to supply the stipulated amount of water, that is, enough to drive the two wheels ?

If the intention had been to reserve in the defendants the right at any time to terminate the lease by shutting off entirely the water from the canal, why was it not so put in the instrument in terms unambiguous and clear ?   Why was a right so important to both parties, the exercise of which might be attended with consequences so ruinous to the lessees, left to be inferred by means of a construction, more than doubtful, of a clause in the document which appears on its face to relate to the general control of the water in the reservoir upon which the supply in the canal was dependent ?   We think the lease is not capable of such a construction.

The right to control the water in the river, mill-ponds, lakes, etc., upon which the water to supply the canal depended, and to discharge the same therefrom at pleasure, was most certainly reserved to the lessors.   If the defendants had occasion to draw the water in the dam— which is understood to include the whole of the Lake Winnipissiogee— so low that enough would not naturally flow through the canal to supply the quantity required by the lease, it is clear they would have the right to do so, and the only remedy of the lessees would be an abatement of rent.   So, if, in the course of such general management and control, they had occasion to hold back all the water and so wholly stop its flow in the river, the only remedy of the lessees upon their lease would still be an abatement of rent.   But suppose the water above the dam stands at a sufficient height to furnish the required amount to the canal ; and suppose, at the same time, in their control of the water in the river and the discharge of it from their dam, the defendants erect a barrier to prevent its flow into the canal, still permitting a quantity sufficient to answer the call of the lease to pass at some other point,—through a sluice directly into the river, or through some other canal for the use of some other mill, and so into the river: would such a management and control of the water come within any fair interpretation of the clause reserving the right ?   We think not.

The fair and sensible construction of the lease, as it seems to us, is, that the flow of water in the canal was in general to depend upon the height at which the defendants might choose to keep it in the reservoir; and such we think must have been the understanding of the parties, as shown by the language they employed.

Whether under any circumstances or upon any contingency the defendants, in the reasonable exercise of their reserved right to control the water in the reservoir and regulate its discharge, might hinder its flow from the dam into the canal, and so interrupt, temporarily, the natural and usual dependence of its flow in the canal, upon its height in the dam, we need not now inquire. It is enough that no such contingency is shown. To justify the erection of a barrier at the head of the canal would doubtless require an extraordinary state of facts, of which we have no hint or suggestion at this time.

So far as the lessees are concerned, the defendants' right to control the quantity of water in their reservoirs, and the amount of its discharge therefrom into the river, seems to be absolute and unrestricted. They may hold it back until it accumulates to an indefinite height above their dam, and so they may discharge and draw it down indefinitely at their pleasure. But the right to interfere with the natural and necessary relation between its condition and flow in the canal and its condition as to height in the reservoir can only exist when and so far as such interference may be necessary in the reasonable exercise of their right to control the accumulation and discharge of water from the reservoir.

The result of our conclusions upon this point is, that the lessees are entitled to have the canal kept in substantially the same condition, so far as regards its capacity for conducting water from the dam to the points where the lessees are to take it, as when the lease was executed; and that the plaintiff must have a suitable and proper order with respect to the obstructions complained of to carry out these views. It is said, further, that this instrument creates simply a tenancy at will, because by its terms the lessees may terminate it at their pleasure. The words are, " to have and to hold said demised premises to said lessees for and during their pleasure."

It is not contended but that a lessor may, by express covenant, grant an estate, the duration of which shall depend upon the pleasure of the grantee, and when that is done there can be no pretence that the estate so created is a tenancy at will, in the ordinary legal signification of the term.

The question here is, What were the meaning and intention of the parties in this respect as shown by the language of the habendum above quoted, read in the light thrown upon it by the rest of the instrument? One covenant is, " and the said parties agree with each other that all the covenants and agreements herein contained shall extend to and bind their legal representatives." The inquiry now is, not what estate is created by this clause, but what effect, if any, is to be given it upon the question whether the estate created is or is not a strict tenancy at will, as claimed by the defendants.

On its face this clause appears to be important, and must have been so regarded by the parties. It could not have found its way into the instrument without some design. It must have been understood to have some meaning and effect. It certainly cannot be stricken out as senseless or repugnant, and there can be no doubt but that we must give it some effect, if possible.

Putting this clause and the words in the habendum together, it reads "to have and to hold said demised premises to said lessees and their legal representatives for and during their pleasure."

Now, whatever else may be meant by the term "legal representatives" of the lessees, it certainly does not mean the lessees themselves. It is equally certain that it must mean some person or persons to whom the demised premises may legally pass from the lessees, and this, to say the least, implies an assignment either by operation of law or by the act of the lessees themselves. The clear intention, then, was to create an assignable estate. That being so, the intention was not to create a strict tenancy at will, for that is not an interest or estate capable of assignment. The bearing of this covenant, therefore, upon the construction of the words in the habendum, which we are considering, would seem to be conclusive that they were intended as an express covenant for an estate greater than a tenancy at will. Whether that estate was understood by the parties to be a fee-simple, or an estate for life, or a term, the length of which was at the option of the lessees, is of no consequence so far as regards this point. It is sufficient that they intended to create an estate which might be conveyed by assignment, and not a mere tenancy at will. The words in the habendum are, at least, equally capable of a construction to tally with the obvious intention of the parties as thus expressed; and, without going further, we have no hesitation in holding that such is the construction they must receive, and, therefore, that the estate granted is not a simple tenancy at will.

We think the evidence excepted to as to expenditures made by the plaintiff on the Tucker lot was admissible on the question of reforming the lease.

The word "heirs" does not appear in the lease. The defendants thereupon contend that, at most, it conveys only a life estate to the lessees. The plaintiff claims that the whole instrument read together is sufficient to give a perpetual right to take and use the water upon the terms and conditions therein specified,—that is, a fee,—but at the same time moves that, in case the court should be of a different opinion, the lease may be reformed by inserting the proper word of inheritance, so as to express in legal language the actual contract of the parties according to their intention when it was made.

Before proceeding to consider the question thus raised, we may as well say, that, from an examination of the lease alone, without resorting to extrinsic evidence at all, we entertain no doubt that the understanding and contract of the parties were as claimed by the plaintiff. The defendants demised and leased to the plaintiff and others the right

to draw a certain quantity of water from their canal through a flume to the plaintiff's mills and buildings on certain land, for the use and operation of the plaintiff's mills and machinery; gave the plaintiff the right to maintain the flume and keep it in repair, and for that purpose to enter upon the defendants' land, " to have and to hold said demised premises to the said lessees, paying a certain yearly rent." Everything included in those stipulations " shall extend to and bind their legal representatives;" the fair meaning of which is, that every right of the parties under the instrument shall extend to their legal representatives. This is all expressed in the common language of the country. No technical words, presumed to be used in a settled, technical, legal sense, are employed. The intention of the parties is therefore to be found in the ordinary, natural, and popular signification of the written language in which they chose to express themselves. In point of fact, there is nothing for construction here at all, for it is a primary maxim that it is not permitted to interpret what has no need of interpretation. It is not permitted to the court to defeat the plainly expressed intention of the parties, by distorting, explaining away, or wresting from its commonly received import the language they have used, under the name and guise of construction.

The language of this lease, in its ordinary, natural, and popular sense, makes the intention of the parties to pass a perpetual right obvious and unmistakable. Such being, in fact, the manifest meaning of the instrument, and the indubitable intention of the parties as therein expressed, it might not be difficult to find authority on which to hold that the deed should be treated as reformed in conformity with that intention under the prayer for general relief in the bill. *Busby v. Littlefield*, 31 N. H. 200, and authorities cited.

There may also be room for doubt whether the defendants, having entered into a covenant in terms undeniably sufficient to bind a corporation of this sort forever, could be permitted to repudiate it on the ground that the estate is limited to the legal representatives rather than the heirs of the lessees, so long as the conditions upon which the estate was granted continue to be performed by any one who comes within the class designated by the term legal representatives. Coke Litt. 9 *b.*, 94 *b.*; 2 Bl. Com. 108, notes; 4 Kent Com. 7; 1 Washb. R. P. 58. We have not chosen, however, to examine either of these propositions, but prefer, rather, to inquire whether there exists in this state any law whereby a legal contract, fairly and openly concluded between the parties, and by them put in writing in terms so plain as to leave no room for doubt as to the obligations they have thereby mutually assumed, is set aside and nullified for want of a single word, purely technical in its legal effect, which adds nothing to the sense of the instrument, and can only be made consistent with the intention it is held to express by an interpretation which withdraws it entirely from all the ordinary uses of the language in which it is found. There being no doubt as to what the contract between these parties was, no doubt as to the meaning of the lease, the question we propose to consider is,

whether that contract is to be destroyed by an application of the proposition that to create a fee the word "heirs" must be employed.

Suppose A, being the owner in fee of a piece of land, by a deed duly executed, conveys to B all "his estate and interest therein," and expressly declares in the same deed that B, having paid him the full value of the land, it is his intention, and the effect of the deed shall be, to pass an absolute title in fee simple to B: a rule of law defeating that intention, and preventing the deed from having the effect intended to be given by its express terms—construing the language, "This deed shall pass, and shall be construed to pass, a fee," to mean "This deed shall not pass, and shall be construed not to pass, a fee," because the superfluous word "heirs" was not used—would undoubtedly strike the unlearned with a degree of astonishment. Such a rule must appear to an intelligent layman, unfamiliar with the mysteries of the fossil remains of feudal institutions, as arbitrary, destructive, tyrannical, and in most violent conflict with all ideas of legal reason which such a person can comprehend.

The question whether that rule is part of the law of this state is presented for our consideration in the present case, in a form which differs in no material respect from the case supposed for illustration.

It is said to be a rule of the common law, that without the word "heirs" a fee-simple in land cannot pass by deed; and that this rule is so absolute and unyielding, that, no matter how clearly the intention of the grantor to convey a fee may be stated in the deed, such intention can be of no avail without that word. Washb. R. P., Bk. I, ch. III, sec. 53, and authorities in notes. *A priori* we should expect to find a rule which in its practical application brings about results so anomalous and absurd, but which is, nevertheless, enforced with such remorseless rigor by the courts, upheld by reasons very plain and very imperative. Naturally we should also expect that the books, which are full of cases where its application has produced palpable injustice, more or less aggravated according to circumstances, would also be filled with strong and conclusive reasons in its support. On the contrary, what does appear? I venture to affirm that since the revolution by which the house of Stuart was finally excluded from the British throne, when most of the shackles which feudalism had riveted upon the tenure of lands throughout the kingdom were removed, not a reason, nor the semblance of a reason, growing out of the condition and wants of society, the progress of civilization, the exigencies of trade, or the analogies of the law, can be found in its support in any country or state where the common law has been used.

The rule is a feudal one: that it had no place in the laws of the Saxons is shown by Reeves. Speaking of the form of charters at about the time of the Norman conquest, he says,—"The words of limitation to convey a fee, whether absolute or conditional, were divers;" and after giving a number of Latin forms which were used, some of them containing the word "*haeredibus*," and some not, he continues, "from which divers ways of limiting estates (and numberless other

ways might be produced) it must be concluded that no specific form had been agreed on as necessarily requisite to express a specific estate; but the intention of the granter was collected, as well as could be, from the terms in which he had chosen to convey his meaning." 1 Reeves's Hist. Law (Finlason) 42.

Blackstone says,—" This very great nicety about the insertion of the word 'heirs' in all feoffments and grants, in order to vest a fee, is plainly a relic of the feodal strictness; by which we may remember it was required that the form of the donation should be punctually pursued; or that, as Cragg expresses it in the words of Baldus, ' *donationes sint stricti juris, ne quis plus donasse praesumatur quam in donatione expresserit.*' And, therefore, as the personal abilities of the donee were originally supposed to be the only inducements to the gift, the donee's estate in the land extended only to his own person, and subsisted no longer than his life; unless the donor, by an express provision in the grant, gave it a longer continuance, and extended it also to his heirs." 2 Bl. Com. 107. Chancellor Kent says,—" The rule was founded originally on principles of feudal policy which no longer exist, and it has now become entirely technical," and he gives the same reason for it as Blackstone. 4 Kent Com. 6.

To comprehend fully the reasons which gave birth to this rule, we ought to recall not only the nature of the feudal tenures of land in England, but the history of the origin and development of the system itself, which before the close of the eleventh century had succeeded, mainly by conquest and force, in vesting the ultimate ownership of nearly all the lands in England, as well as on the continent of Europe, in the feudal lords, and parcelling them out among a few military chieftains or leaders of bands of predatory barbarians.

This is not the place for an extended review. In a brief recapitulation Guizot says,—" I will once again recall to you the first origins of the feudal relations. As you are aware, they go back to the Germanic warlike band; they are a consequence, a transformation of the relations between the barbarous chief and his companions.

" The relations between the barbarian chief and his companions, it will be recollected, had two essential characteristics. 1. It was purely personal, engaged only the individual who acceded to it of his own choice, and in no way involved his family, his children, his descendants. 2. It was, moreover, perfectly free; that is to say, the companion was at liberty to quit the chief when it suited him, to enter into another band, to associate himself with another expedition. Upon personality and liberty reposed the mobile society, which was the basis of feudal society.

" The territorial establishment once accomplished, by the mere introduction of landed property into the relation between the chief and the companions, it was greatly modified. From the very nature of landed property it followed that the relation became less free, less mobile. The companion attached himself to the estate which he had from his chief; it was not so easy for him to quit his estate as formerly to quit

his chief. The will of the individual was constrained to fix itself more firmly; the social tie was stronger. The relation accordingly lost its personality. Landed property necessarily tended to become hereditary; inheritance is its natural, normal condition. The relation between the vassal and the suzerain follows the same law; it was not only personal, but hereditary; it engaged the children as well as the father, the future as well as the present. As it was more strong, the social tie was more durable.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Still, the primitive character of the relation was not abolished; far from it. Instinctively, by the sole power of manners, an effort was made for it to remain free and personal; as much so, at least, as was compatible with the new state of facts. Whenever there was a change in the persons between whom the relation was established,—that is to say, whenever the vassal died,—the social tie had to be renewed. The son did not tacitly and without ceremony become the vassal of his father's suzerain; but a formal act was necessary on his part to place him in the same situation, to make him contract the same rights and the same duties. It was necessary, in a word, that the relation should take the character of personality. This, in fact, is the character which they sought to give it by the ceremonies of homage, the oath of fidelity and investiture." 4 Guizot Hist. Civ. (Appleton & Co., 1867) 63. "The feudal relation being in its origin purely personal, no one could, as may easily be conceived, impose upon the suzerain another vassal than him whom he had adopted, with whom he had treated. Accordingly, in the earliest ages, the vassal was not allowed to sell his fief without the consent of his lord. Still, as this stagnation, this immobility of fiefs, was very inconvenient, even impracticable in civil life, the permission to sell fiefs was soon introduced under one form or another, and on more or less favorable conditions; but in being introduced it gave rise, for the profit of the suzerain, to a right, either for redemption or indemnity, at each change. Accordingly, from the tenth century, the suzerain might in France either resume the fief by paying its value to the possessor, or exact a certain sum from the purchaser, generally equal to a year's rent." Id. 73.

Reeves states the same thing in effect concerning tenures in England, as follows: "Military service being required by express statute" (the laws of William the Norman, chaps. 52 and 58, whereby feudal tenures were, as Reeves maintains, fastened upon the land, and the nature of the services on which it should be held established), "the other effects of tenure were deductions from the nature of that establishment. As all the king's tenants were supposed to have received their lands by the gift of the king, it seemed not unreasonable that upon the death of an ancestor the heir should purchase a continuance of the king's favor by paying a sum of money called *a relief* for entering into the estate. As he would be bound to the same service to which his ancestor was liable, and which was the only return that could be made in consideration of his enjoying the property, it seemed reasonable that the king should

judge whether he was capable by his years of performing the services; if not, that *he* as lord should have *the custody of the land* during the infancy, by the produce of which he might provide himself with a sufficient substitute, and in the meantime have the care or *wardship* of the infant's person, in order to educate him in a manner becoming the character he was to support as his tenant." 1 Reeves Hist. Law 66.

This right, which the lord had of exacting a certain sum of money from the new possessor when his vassal sold his fief, is but one of seven fruits and consequences inseparably incident, as Blackstone says, to the highest species of tenure, that of knight-service,—namely, aids, relief, primer seizin, wardship, marriage, fines for alienation, and escheat; all showing the inexorable tenacity with which the lords retained their control of the land.

Blackstone says,—"At the first introduction of feuds, as they were gratuitous, so also they were precarious, and held at the *will* of the lord, who was then the sole judge whether his vassal performed his services faithfully. Then they became certain for one or more *years*. Among the ancient Germans they continued only from year to year.
\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

" But, when the general migration was pretty well over, and a peaceable possession of the new-acquired settlements had introduced new customs and manners; when the fertility of the soil had encouraged the study of husbandry, and an affection for the spots they had cultivated began naturally to arise in the tillers,—a more permanent degree of property was introduced, and feuds began now to be granted for the *life* of the feudatory. But still feuds were not yet *hereditary*, though frequently granted by the favor of the lord to the children of the former possessor; till in process of time it became unusual, and was therefore thought hard, to reject the heir, if he were capable to perform the services.   \*   \*   In process of time feuds came by degrees to be universally extended, beyond the life of the first vassal, to his *sons*, or perhaps to such one of them as the lord should name, and in this case the form of the donation was strictly observed; for, if a feud was given to a man and his *sons*, all his sons succeeded him in equal portions, and as they died off, their shares reverted to their lord, and did not descend to their children, or even to their surviving brothers, as not being specified in the donation. But when such a feud was given to a man and his *heirs*, in general terms, then a more extended rule of succession took place; and when the feudatory died, his male descendants *in infinitum* were admitted to the succession.   \*   \*   \*

" Other qualities of feuds were, that the feudatory could not aliene or dispose of his feud; neither could he exchange, nor yet mortgage, nor even devise it by will, without the consent of the lord. For the reason of conferring the feud being the personal abilities of the feudatory to serve in war, it was not fit he should be at liberty to transfer this gift, either from himself, or from his posterity, who were presumed to inherit his valor, to others who might prove less able." 2 Bl. Com. 55.

Montesquieu says,—" It cannot be doubted but that at first fiefs were revokable." Spirit of Laws, bk. 30, ch. 16. Guizot does not assent to this. He thinks the texts cited by Montesquieu prove a fact, and not a law." " Doubtless the king or any giver of benefices," he says, " who found himself more powerful than the receiver, took back his gift when he felt the desire or need; but that it was the legal state of this kind of property that possessors of fiefs acknowledged the right of the givers to take them back when they pleased, there is no evidence to show." He also thinks that in the outset feuds were more permanent than Blackstone and other publicists seem to suppose. 3 Guizot Hist. Civ. 346, 349.

These extracts are enough to show that the word " heirs," when first introduced into charters and feofments, was a word of very great importance. It enlarged the right of the vassal from one held either at the will of the lord, or for his own life, to a permanent and hereditary interest. It signified an undertaking by the lord that he would accept the heir as his vassal, and that all the rights and obligations growing out of that relation should be extended to him. It was, in effect, simply a stipulation for a renewal of the lease upon the same terms with the heir of the first lessee. They also show to some extent the nature of the institutions and condition of society in which the rule we are speaking of originated and to which it was applicable, and strongly present the contrast between those institutions and our own.

It is important to our inquiry that the utter repugnancy and hostility of feudal institutions to ours should be fully borne in mind. A few more extracts, presenting the contrast in a striking light, may not be superfluous.

According to Guizot, one of the three constituent elements or essential facts of the feudal system was the amalgamation of sovereignty with property. 3 Hist. Civ. 341. He says,—" When I speak of the amalgamation of sovereignty and of property, I repeat that I only speak of the possessor of the fief within his own domains, and over their inhabitants not themselves possessors of fiefs. * * * Originally, in the right, in the spirit of the system, each lord exercised the legislative, judicial, and military powers in his domains; he made war, coined money, &c.;—in a word, he was a sovereign." *Ib.* 359. " We will now descend to the foot of the castle, into those miserable dwellings where the tributary population who cultivated its domains lived. Its situation bears no resemblance to that of the inhabitants of the castle: nothing defends it, nothing shelters it; it is exposed to all dangers, a prey to continual vicissitudes; upon it, and at its expense, burst forth all the storms which occupied the life of its master. Never, perhaps, did any population live more utterly destitute of peace and security, abandoned to a more violent and incessantly renewed movement. At the same time its condition appears stationary: for a long time we can see no general and notable change. Through all the commotion which constantly agitated it, we almost always find it the same —much more immovable, more foreign to social movement, than the

little society which lived above it, behind the ramparts and moats of the castle. * * The coloni were attached to the estate; their legal definition formally says as much: *servi terrae, glebae inhaerentes.* They could not, under any pretext, quit the domain to which they belonged; and if they happened to make their escape, the proprietor had a right to claim them in whatever place he found them, and in whatever profession they might be engaged. 'We order that laborers be attached to the glebe, in such a manner that they cannot be taken from it, even for a moment.' Cod. Just., tit. 47, 1. 15. 'Let all fugitive laborers, without any distinction of sex, function, or condition, be forced by the governors of the provinces to return to the places where they were born, have been brought up, and paid the quit-rent.' *Ibid*, 1. 6. '*It* is fitting that henceforth laborers who have thought of escaping should be loaded with irons, in the manner of slaves.' Cod. Theod., 1. v, tit. 9. Laborers, like slaves, were subject to corporeal punishment, and were deprived of all right of complaint, of all civil action against their patron, against the proprietor of the soil." 4 Guizot Hist. Civ. 37, *et seq.*

It was with entire justice that Mackintosh characterized a feudal kingdom as " a confederacy of a numerous body, who lived in a state of war against each other and of rapine towards all mankind, in which the king, according to his ability and vigor, was either a cipher or a tyrant, and a greater portion of the people were reduced to personal slavery." Mackintosh's Hist. of Eng., ch. 3.

In a dissertation on the canon and feudal law, John Adams said,— " In the latter [the feudal law] we find another system, similar in many respects to the former, which, although it was originally formed, perhaps, for the necessary defence of a barbarous people against the inroads and invasions of her neighboring nations, yet for the same purposes of tyranny, cruelty, and lust, which had dictated the canon law, it was soon adopted by almost all the princes of Europe, and wrought into the constitutions of their government. It was originally a code of laws for a vast army in a perpetual encampment. The general was invested with the sovereign propriety of all the lands within the territory. Of him, as his servants and vassals, the first rank of his great officers held the lands; and in the same manner the other subordinate officers held of them; and all ranks and degrees held their lands by a variety of duties and services, all tending to bind the chains the faster on every order of mankind. In this manner the common people were held together in herds and clans in a state of servile dependence on their lords, bound, even by the tenure of their lands, to follow them, whenever they commanded, to their wars, and in a state of total ignorance of everything divine and human, excepting the use of arms and the culture of their lands." He then goes on to speak of the confederacy between those two systems of tyranny, the ecclesiastical and civil, whereby each was to aid the other in maintaining its supremacy, and the struggle between the people on the one hand and this confederacy on the other, commencing at the time of the reforma-

tion, and continues,—" It was this great struggle that peopled America. It was not religion alone, as is commonly supposed; but it was a love of universal liberty, and a hatred, a dread, a horror of the infernal confederacy before described, that projected, conducted, and accomplished the settlement of America.

" It was a resolution formed by a sensible people—I mean the Puritans—almost in despair. * * * This people had been so vexed and tortured by the powers of those days, for no other crime than their knowledge and their freedom of inquiry and examination, and they had so much reason to despair of deliverance from those miseries on that side the ocean, that they at last resolved to fly to the wilderness for refuge from the temporal and spiritual principalities and powers, and plagues and scourges of their native country.

" After their arrival here they began their settlement, and formed their plan, both of ecclesiastical and civil government, in direct opposition to the canon and the feudal systems." 3 Life and Works of John Adams 350.

It was to answer one of the conditions upon which the existence of such a system depended that the rule in question was introduced. Unless the lord bound himself that the fief should go to the heir of his vassal, the heir had no rights in it on the death of his ancestor, but the lord, being the absolute owner of the soil, might bestow the fief upon any stranger who would enter into homage and do fealty to him for the land, upon such new services as he might impose.

The rule was nothing more nor less than the practice of the feudal sovereign, securing and perpetuating his grasp upon all the land, and the services of all the landholders in his realm. Its origin, purpose, and history show it to be in no way adapted to our institutions, system of government, or condition of society. As a feudal rule of construction, it was a recognition of the fact that the vassal held his lord's land upon the condition of rendering in his own person certain services to his lord. The vassal, thus holding the land by reason of the personal trust and confidence reposed in him by his lord, could not assign, nor could his heirs inherit, his obligation of personal service on the land held on such a condition. *Flanders* v. *Lamphear*, 9 N. H. 201; *Eastman* v. *Batchelder*, 36 N. H. 141; *Bethlehem* v. *Annis*, 40 N. H. 34, 41, 42. The feudal rule is inapplicable to a conveyance of New Hampshire land not held by any such tenure.

When the fetters which feudalism had fastened upon the tenure of lands in England fell off, every reason on which this rule had rested fell with them. Why should the rule itself be retained ? Lord Coke says,—" *Cessante ratione legis, cessat ipsa lex* "—Coke Litt. 70 b; and that has come to be—indeed, it was then—one of the most familiar maxims of the law. The fourth maxim of construction of statutes laid down by Dwarris is, An act of parliament cannot alter by reason of time; but the common law may, since *cessante ratione cessat lex*. Potter's Dwar. 122.

But suppose the rule was retained in England after the reason of it

ceased, and that it was engrafted upon the common law at the time of the settlement of this state and the adoption of the constitution, the question is, Has it been adopted here? The framers of the constitution, in providing for the continuance of such laws as had theretofore been adopted and approved, etc., wisely excepted such parts thereof as should be found repugnant to the rights and liberties contained in that instrument. Const. N. H., art. 90. This implies that there might be some parts of the common law to which the exception should be applied. With all the devotion to the general principles of the common law, which eminently distinguished that generation of men, they could not fail to see that as a body of municipal law it was not wholly free from defects. They must have known, as Judge Cooley says, that many of its features were exceedingly harsh and repulsive, and gave unmistakable proofs that they had their origin in times of profound ignorance, superstition, and barbarism; that the feudal system, which was essentially a system of violence, disorder, and rapine, gave birth to many of its maxims; and that some of these, long after that system had passed away, might still be traced in the law, especially in the rules which govern the acquisition, control, and enjoyment of real estate. Cooley's Const. Lim. 22. Hence the exception. Accordingly it has many times been held, under our constitution, that if there is any part of the common law incompatible with our institutions, or not adapted to our circumstances, it does not prevail here. *Lisbon* v. *Lyman*, 49 N. H. 582, and cases cited.

They who brought the general body of the common law with them to this region might well have omitted to bring the feudal rule, not because it was fabricated in a barbaric age, but because it was designed and fitted to perpetuate a barbaric condition; not because it originated in a foreign land, but because it was not suited to the commonwealth which our foreign ancestors came to this country to organize; not because, as a part of the military system of Europe, it was less necessary in feudal times than other compulsory methods of filling armies and navies in other times, but because the general feudal relation of lord and vassal not being an incident of New Hampshire civilization, and the particular debt of personal service due from the vassal to the lord (which the heirs of the vassal might be incompetent to perform) not being a universal consideration of the conveyance of New Hampshire real estate, the feudal rule (requiring the word "heirs" as evidence of the lord's intention to assume the risk of his vassal's heirs being incapable of the stipulated service) was inapplicable to the situation and circumstances of the emigrants, and implied a servitude inconsistent with the principles of personal freedom and equality which pervaded their social and political plan, hostile to the general object of their emigration, and particularly subversive of that absolute ownership of the soil which they specially sought in the New World.

It appears that in Massachusetts, prior to 1651, the word "heir" was "oftentimes omitted when an estate of inheritance is intended to be passed by the parties;" and in that year a statute was passed by

the general court introducing the feudal rule, which has been maintained in that state by statute ever since. *Sedgwick* v. *Laflin*, 10 Allen 430. When the union which at that time existed between Massachusetts and New Hampshire was dissolved, the people of the latter province, in 1680, adopted a code made up mainly by copying such of the Massachusetts statutes as they thought adapted to their wants. In that code this act was omitted, and no statute on the subject has ever existed here. The word must have been omitted as often proportionally here as in Massachusetts; and when the attention of our people had been directed to the subject by a statute under which they lived for twenty-eight years, the omission could hardly have been accidental. They were for several generations engaged in vigorously resisting Mason's claim to a proprietorship, which if maintained would have given him a substantial baronial dominion over the whole province, with the title of lord-protector, which he assumed. Belk. Hist. N. H. 94 (ed. 1831);—and see 1 N. H. Prov. Pap. 433–582. There was nothing in their history in this, any more than in the old country, calculated to impress them with the expediency of introducing the mediæval rule, either by statute, or by consent and general understanding without a statute. We know of no reason why they should have desired or intended to do so.

The effect of the Massachusetts statute in *Sedgwick* v. *Laflin* illustrates the difficulties and injustice occasioned by importing a rule so incompatible with American institutions as to be capable, upon legal principles, of being introduced by nothing short of express legislation. Like many other arbitrary rules that might be made, it would prevent some litigation that would be necessary for ascertaining the intention of the parties upon rules of construction calculated to discover their intention. But the evils of such litigation cannot be compared with the gross injustice that would be perpetrated by such a rule, arbitrarily and summarily defeating the intention of the parties, where the evidence happened not to be sufficient (as it would be likely to be now that the parties can testify) to induce them to resort to litigation to have their deeds reformed and their intentions carried out in suits in chancery.

The rule has never been judicially declared to be the law in this state. Doubtless there are, in one or two cases where the construction of a will was under consideration, remarks of judges which indicate that they may have understood it to be in force here as to deeds. There are, on the other hand, two cases containing observations deserving of more attention. I refer to *Hutchins* v. *Carleton*, 19 N. H. 487, and *Mack* v. *Jones*, 21 N. H. 393. *Hutchins* v. *Carleton* was somewhat complicated in its facts; but the effect of an instrument written on the back of a mortgage, and executed with all the formalities of a deed, but not containing the word "heirs," was before the court. In speaking of that instrument, WOODS, J., says,—"There seems to be no objection to regarding the instrument of January 28, 1838, indorsed upon the mortgage, and executed with the formalities necessary for passing real estate, as having actually conveyed from

Stevens to Giles the fee-simple, which, in contemplation of law, was perfected in him by the two deeds of Greenwood, or at least a freehold, if the terms of the habendum be deemed insufficient to enlarge the words of the grant to a greater extent."

It is quite certain that no such remark would have been made by that careful and accurate judge had he understood there was no question of the rule being in force in this state.

*Mack* v. *Jones* was case against the selectmen of Marlow for assessing an illegal tax against the plaintiff on a piece of land called the school lot, conveyed to one Silas Mack in 1803 by said town, " to hold possession of said premises, free from taxes, till grass shall cease to grow and water to run." The deed did not contain the word " heirs." The point decided was, that the town could not by grant exempt land from taxes. But PERLEY, J., delivering the opinion of the court, says,— " If the deed can take effect according to the popular sense of the language used, and the probable intention of the parties, Silas Mack and his assigns, since the payment of the securities mentioned in the deed, have been the absolute and unconditional owners of the land. The town retains no interest whatever. There are, however, no words of inheritance used in the deed, and, unless the rule of the common law has been relaxed in this state, Silas Mack took only an estate for life."

This seems to imply that the court in 1850 regarded it as doubtful whether the rule was so adapted to our institutions and the condition of the country as to be adopted with the great body of the common law. It is not probable that twice within the space of two years,—once in 1849 and once in 1850,—the court would have invited the mooting of a question which they thought to be at rest.

The rule was not applied at common law in England to the construction of wills—Coke Litt. 322, *b;* Com. Dig., Devise (n. 4) ; Chitty's note to 2 Bl. Com. 108—nor in this state, irrespective of the statute of 1822—*Fogg* v. *Clark,* 1 N. H. 163 ; *M'Afee* v. *Gilman,* 4 N. H. 391 ; *Forsaith* v. *Clark,* 21 N. H. 409—where, although the decision was after the statute, the will was proved very long before.

In *Loveacres* v. *Blight,* Cowp. 352, Lord MANSFIELD said,—" I really believe that almost every case determined by this rule, as applied to a devise of lands in a will, has defeated the real intention of the testator ; for common people, and even others who have some knowledge of the law, do not distinguish between a bequest of personalty, and a devise of real estate. But, as they know when they give a man a horse, they give it him forever ; so they think if they give a house or land, it will continue to be the sole property of the person to whom they have left it. Notwithstanding this, where there are no words of limitation, the court must determine in the case of a devise affecting real estate, that the devisee has only an estate for life ; because the principle is fully settled and established, and no conjecture of a private imagination can shake a rule of law.

" But as this rule of law has the effect I have just mentioned, of defeating the intention of the testator in almost every case that occurs,

the court has laid hold of the generality of other expressions in a will, where any such can be found, to take the devise out of this rule.   *   * In general, wherever there are words and expressions, either general or particular, or clauses in a will, which the court can lay hold of to enlarge the estate of a devisee, they will do so to *effectuate the intention."* He did not explain by what authority the court has laid hold of the generality of other expressions in a will to take the devise out of this rule, or how it would be possible in that way to give effect to the intention of the testator without shaking a rule of law by the conjecture of a private imagination, *provided it is a rule of law* that the word " heirs " is indispensable to the passing of a fee.   Nor did he do what would have been more useful still, that is to say, point out the reason for a distinction in this respect between the construction of a will and a deed.   The reason for not applying the rule to wills is sensible and easily understood.   It is, as Lord Coke expresses it, *quod ultima volun- tas testatoris est perimplenda secundum veram intentionem suam.*   Coke Litt. 322, *b.*   But this shows no reason for the distinction.   It does not show why the intention of the maker of the instrument is any more sacred in one case than in the other, nor by what right the court can abrogate the rule in favor of one class of donees, if it must be rigidly enforced against the other.   If for any reason, however mysterious, a fee in land could not pass without the use of this potent word, all efforts of the court to bring about such a result where the word was wanting, whether in a will or deed, must have failed. ˙ But in the case of wills those efforts did not fail.   What, then, became of the feudal rule ?   It yielded to reason.   It was swept away by the monstrous ab- surdity and injustice which its application must involve.   It could not stand, because no enlightened court could uphold it, and in so doing defeat the manifest intention of the donor, without feeling that they were ministers of arbitrary oppression and wrong rather than of law. For obvious reasons the same question as to defeating the intention of the grantor in a deed seldom comes up.   But when it does arise, how can that intention be defeated without involving a violation of common right and common sense, equally glaring and flagrant ?   Where is the reason for upholding the rule as to deeds, and rescinding it as to wills ? By what right can the courts say that the intention of a testator plainly written in his will shall govern, but the intention of a grantor as plainly written in a deed of bargain and sale shall be set at naught, the consideration of the sale be disregarded, and the property be thrust back upon the grantor or his heirs, on the death of the grantee, for the want of this feudal word of inheritance ?

In the nature of things the word is no more necessary to the valid conveyance of land than to the valid conveyance of a horse.   Its use was necessary in the scheme of a semi-barbarous institution, a vast engine of slavery and oppression, an instrument of violence and dis- order, which had no better security for its continued existence than superiority of brute force, and which was swept away upon the dawn of a better civilization more than five hundred years ago.   Why is its

use still required in one class of instruments and not in the other, when both have the same object in view, namely, the conveyance of land?

I have not found any answer to this inquiry.

The legal signification and effect of the word as used in our deeds of bargain and sale are purely technical. Strictly speaking, there is no one in existence at the time of the grant to answer the description. *Nemo est haeres viventis.* Those who may become the heirs of the grantee take not the slightest present interest by virtue of the word. The conveyance vests the absolute and unlimited ownership in the grantee; the word imposes no restraint on his power of alienation. Nevertheless it has a settled and well understood meaning as thus used, and, as a legal term, is very convenient and useful to show that the estate granted is a fee. It could not now be safely omitted without using some other form of expression showing with legal accuracy the intention and contract of the parties.

Of course it will not be omitted by any conveyance or other person who knows the significance it has thus acquired. But when a case arises where the intention of the grantor to convey a fee simple is clearly shown by other words in the deed, we think the court have no power to say a fee shall not pass because he has not, in addition, inserted this technical word, using it in a sense entirely distinct and different from its usual and common import.

Our conclusion is, that the rule, which would defeat the obvious intention and destroy the plainly expressed contract of the parties in the present case, is not adapted to our institutions or the condition of things in this state; that it never became part of the law of the state, and, therefore, that this instrument conveys to the lessees a perpetual right to take and use the water upon the terms and conditions specified, which right may pass to their heirs and assigns as a fee.

*A decree is to be entered in accordance with these views.*